**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Marcus A. WILMINGTON, Appellant.**

Superior Court of Pennsylvania.

Argued Sept. 28, 1998.

Filed March 31, 1999.

---

Robert M. Rosenblum, Stroudsburg, for appellant.

E. David Christine, Jr., Asst. Dist. Atty., East Stroudsburg, for Com., appellee.

Before McEWEN, President Judge, and CAVANAUGH, DEL SOLE, KELLY, EAKIN, JOYCE, STEVENS, SCHILLER, and LALLY–GREEN, JJ.

McEWEN, President Judge.

¶ 1 This Court granted the petition for reargument filed by the Commonwealth in this case to consider whether the Pennsylvania Constitution prohibits the random stopping of a Greyhound bus at a toll plaza on a rural interstate to permit police officers to conduct a "drug interdiction investigation" in the absence of reasonable suspicion or probable cause to believe that an

individual on the bus is transporting narcotics.

¶ 2 Our study, as well as our resolution of the competing concerns presented by this case—eradication of the deadly plague visited upon our society by illicit drugs and the preservation of the sacred freedoms guaranteed to us by the Pennsylvania Constitution—is guided by the admonition of our Supreme Court that

> [t]he seriousness of the criminal activity under investigation, whether it is the sale of drugs or the commission of a violent crime, can never be used as justification for ignoring or abandoning the constitutional rights of every individual in this Commonwealth to be free from intrusions upon his or her personal liberty absent probable cause.

*Commonwealth v. Rodriquez*, 532 Pa. 62, 73, 614 A.2d 1378, 1383 (1992).

¶ 3 We conclude, as set forth hereinafter, that the Greyhound bus was seized by the officers when the driver pulled over at their request and that, in the absence of reasonable suspicion or probable cause, the random **stopping** of a bus to allow troopers to interrogate the passengers violates Article I, Section 8 of the Pennsylvania Constitution just as surely as the random stopping of automobiles by such troopers – solely for the purpose of questioning occupants of those automobiles as to their identities and itineraries, would violate Article I, Section 8 of the Pennsylvania Constitution. *See: Commonwealth v. Sierra*, 555 Pa. 170, ——, 723 A.2d 644, 646 (1999) (Opinion in Support of Affirmance); *Commonwealth v. Blouse*, 531 Pa. 167, 169, 611 A.2d 1177, 1178 (1992); *Commonwealth v. Yashinski*, 723 A.2d 1041, 1043 (Pa.Super.1998); *Commonwealth v. Pacek*, 456 Pa.Super. 578, 691 A.2d 466, 469–470 (1997); *Commonwealth v. Zogby*, 455 Pa.Super. 621, 689 A.2d 280, 282 (1997), *appeal denied*, 548 Pa. 658, 698 A.2d 67 (1997); *Commonwealth v. Ziegelmeier*, 454

Pa.Super. 330, 685 A.2d 559, 561–562 (1996); *Commonwealth v. Trivitt*, 437 Pa.Super. 432, 650 A.2d 104, 106 (1994); *Commonwealth v. Lopez*, 415 Pa.Super. 252, 609 A.2d 177, 181–182 (1992), *appeal denied*, 533 Pa. 598, 617 A.2d 1273 (1992).

¶ 4 The trial court, when deciding a motion to suppress, is required to conduct a hearing and make findings of fact and conclusions of law determining whether evidence was obtained in violation of a defendant's rights. *Commonwealth v. Graham*, 554 Pa. 472, 475–477, 721 A.2d 1075, 1077 (1998); *Commonwealth v. DeWitt*, 530 Pa. 299, 302, 608 A.2d 1030, 1031 (1992); Pa.R.Crim.P. 323. While this Court in general, "[i]n reviewing a suppression court's ruling [is] bound by those factual findings of the suppression court which are supported by the record", *Commonwealth v. Sierra, supra* at ——, 723 A.2d at 645 (Opinion in Support of Affirmance)[1], since the trial court in the instant case based its findings solely upon its review of the notes of testimony from the preliminary hearing conducted on December 26, 1996, before District Justice Eyer, "this Court is equally competent to form an opinion as to the facts from the evidence appearing in the record." *Commonwealth v. Jones*, 457 Pa. 423, 431, 322 A.2d 119, 124 (1974), citing *Stanko v. Males*, 390 Pa. 281, 135 A.2d 392 (1957); *Poelcher v. Poelcher*, 366 Pa. 3, 76 A.2d 222 (1950). *Accord: Butler County v. Brocker*, 455 Pa. 343, 349 n. 8, 314 A.2d 265, 269 n. 8 (1974).

¶ 5 On December 11, 1996, Agent Ronald Paret of the Bureau of Narcotic Investigations of the Office of the Attorney General and Monroe County Detective Kirk Schwartz were standing at the toll booths located at the Delaware Water Gap Toll Plaza on Interstate 80 in Monroe County, for the purpose of randomly stopping commercial buses proceeding through the toll

---

1. *Accord: Commonwealth v. Lewis*, 535 Pa. 501, 504, 636 A.2d 619, 621 (1994); *Commonwealth v. Slaton*, 530 Pa. 207, 208, 608 A.2d 5, 5 (1992); *Commonwealth v. Cortez*, 507 Pa. 529, 532, 491 A.2d 111, 112 (1985), *cert. denied*, 474 U.S. 950, 106 S.Ct. 349, 88 L.Ed.2d 297 (1985).

plaza as part of a "drug interdiction operation".

¶ 6 Appellant was a passenger on a Greyhound bus which had left New York City and was en route to Cleveland, Ohio, when Detective Schwartz, as the bus stopped to pay the toll, asked the driver of the bus, Mr. Prather, if he and Agent Paret could board the bus and conduct an investigation. The driver agreed and was directed to pull the bus over onto the apron past the toll booths. The agents obtained and examined the tickets which had been collected by Mr. Prather, who testified at trial that:

A. Once I had been asked by Detective Schwartz if I minded pulling over, **I told them we have drug enforcement agents who are going to get up on the bus and they are going to just routinely go through the bus, I don't know, search it or whatever.** I don't know what they are going to – I could not tell them specifically what was going to happen.

Q. How did you tell them that?

A. On the P.A. system that we have on board the bus.

Q. Did you advise any passengers who didn't want this experience that they could leave the bus?

A. No, I didn't. (N.T. 15) (emphasis supplied).

Agent Paret testified at trial that "... when I boarded the bus, I identified myself using the public address system. I picked up the microphone, spoke to the passengers, identified myself. I identified Detective Schwartz as the other person on the bus with me. **I told them we were on the bus to conduct a brief drug investigation at that time.**" (N.T. 47)(emphasis supplied).

■ ¶ 7 Rule 323(h) of the Pennsylvania Rules of Criminal Procedure places the burden of production as well as the burden of persuasion on the Commonwealth. *Commonwealth v. Hamilton*, 543 Pa. 612, 614, 673 A.2d 915, 916 (1996); *Commonwealth ex rel. Butler v. Rundle*, 429 Pa. 141, 144, 239 A.2d 426, 428 (1968). The only evidence concerning the seizure of the bus offered by the Commonwealth was the following portion of the December 26, 1996, preliminary hearing testimony provided by Agent Paret, the sole witness presented at that hearing:

Q. What did you do at approximately 4:15 p.m. that day [December 11, 1996]?

A. At approximately 4:15 p.m., myself, along with County Detective Kirk Schwartz, had occasion to board a Greyhound Bus at that time.

Q. Upon boarding the bus, what did you do?

A. Upon boarding the bus, I made an announcement on the intercom system of the bus. I identified myself as a narcotics agent. I also identified Kirk Schwartz as a county detective. We were both wearing jackets that also identified ourselves. Subsequently, Detective Schwartz went down the aisle ahead of me. He went into the bus bathroom, and I began speaking with the passengers on the bus.

¶ 8 The trial court, based solely upon its review of the foregoing transcript from the preliminary hearing, then made the following findings of fact:

1. On December 11, 1996, Agent Ronald Paret, a Narcotics Investigator from the Attorney General's Office, and Kirk Schwartz, the County Detective, were involved in drug interdiction surveillance at the Delaware Water Gap Toll Bridge in the Borough of Delaware Water Gap, Monroe County, Pennsylvania.

2. Agent Paret approached the driver of a Greyhound Bus in route from New York to Cleveland, Ohio, and identified himself as a narcotics investigator and asked the bus driver if he could board the bus. The driver consented.

3. When the officers boarded the bus, they attempted to match passengers with carry-on luggage in the overhead luggage racks.

4. Agent Paret asked the defendant if he had any luggage, and the defendant pointed to a white plastic bag on the

floor. Agent Paret asked him if he could look at it. The defendant consented. In it were a new pair of blue, white and silver Asics sneakers, size nine.

5. A Saks Fifth Avenue shopping bag, which was located in the overhead rack directly opposite to where the defendant was seated on the bus, was not identified by any of the passengers as belonging to them. When the bag was unclaimed, one of the officers held it up for all the passengers to see and asked if it belonged to anyone. No one responded, including the defendant.

6. Detective Schwartz removed the bag from the bus and searched it. The search disclosed a package of suspected cocaine and a pair of blue jeans in which part of a check, including a Social Security number, was found. The cocaine was found in an Asics shoe box. The shoe box had written language on it indicating that it once held size nine, blue, white and silver sneakers.

¶ 9 The trial court then concluded, based upon what we view as a misreading of *Florida v. Bostick,* 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991), that:

> ... In *Florida v. Bostick,* 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991), the United States Supreme Court gave its stamp of approval to such practices where bus transportation is involved. Recognizing that the decision when and

where to stop a bus is within the sole control of the bus driver and not the passenger, the Supreme Court concluded that any resulting confinement of a passenger is the natural result of his decision to take the bus and not necessarily a result of coercive police conduct. Applying that rationale to the facts in the case at bar, we conclude that the defendant was not seized within the meaning of the Fourth Amendment.

¶ 10 Thus, while the trial court found that Agent Paret had "detain[ed] the bus on which the defendant was a passenger and examin[ed] the luggage", the trial court, as a result of its misinterpretation of the holding in *Bostick,* found that there had been no violation of the Fourth Amendment.[2] The trial court also found that

> The warrantless search of the bag abandoned on the bus did not constitute an unlawful search since the defendant did not have a reasonable expectation of privacy at the time of the search. *Abel v. The United States,* 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960); *Commonwealth v. Windell,* 365 Pa.Super. 392, 529 A.2d [1115](1987).[3]

¶ 11 Contrary to the belief of the trial court[4], the United States Supreme Court in *Florida v. Bostick, supra,* did not authorize seizures of buses and their occupants in the absence of reasonable suspicion or

**2.** Although raised by appellant, the trial court did not address the claimed violation of Article I, Section 8 of the Pennsylvania Constitution.

**3.** *Commonwealth v. Windell, supra,* has **no** application to the instant case as it did not involve any police conduct, much less illegal police conduct, prior to or related to the abandonment. *See: Commonwealth v. Matos,* 543 Pa. 449, 672 A.2d 769 (1996); *Commonwealth v. Everett,* 546 Pa. 430, 685 A.2d 993 (1996).

**4.** Many thoughtful and eloquently reasoned opinions of our Supreme Court have established that the provisions of Article I, Section 8 of our State Constitution, which predate the Fourth Amendment of the United States Constitution, bestow substantially greater liberty and privacy rights upon the citizens of this

Commonwealth than does its federal counterpart. *See: Commonwealth v. Hawkins,* 553 Pa. 76, 84–86, 718 A.2d 265, 269 (1998); *Commonwealth v. Matos,* 543 Pa. 449, 455, 672 A.2d 769, 772 (1996); *Commonwealth v. White,* 543 Pa. 45, 56, 669 A.2d 896, 902 (1995); *Commonwealth v. Smith,* 532 Pa. 177, 186, 615 A.2d 321, 325 (1992); *Commonwealth v. Edmunds,* 526 Pa. 374, 388, 586 A.2d 887, 894 (1991); *Commonwealth v. Melilli,* 521 Pa. 405, 412, 555 A.2d 1254, 1258 (1989); *Commonwealth v. Johnston,* 515 Pa. 454, 467, 530 A.2d 74, 80 (1987); *Commonwealth v. Sell,* 504 Pa. 46, 63–64, 470 A.2d 457, 467 (1983); *Commonwealth v. DeJohn,* 486 Pa. 32, 43, 403 A.2d 1283, 1288 (1979), *cert. denied,* 444 U.S. 1032, 100 S.Ct. 704, 62 L.Ed.2d 668 (1980).

probable cause. Rather, the Supreme Court granted *certiorari* to review a decision of the Florida Supreme Court, a decision purportedly based on the Fourth Amendment to the United States Constitution, which had adopted a *per se* rule that " 'an impermissible seizure result[s] when police mount a drug search on buses **during scheduled stops** and question boarded passengers without articulable reasons for doing so, thereby obtaining consent to search the passengers' luggage.' " *Florida v. Bostick, supra,* 501 U.S. at 433, 111 S.Ct. 2382, quoting *Bostick v. State,* 554 So.2d 1153, 1154 (Fla.1989)(emphasis supplied).

¶ 12 The United States Supreme Court reversed, holding **only** that a *per se* rule was inconsistent with Fourth Amendment jurisprudence. Importantly, while expressly declining to decide whether a seizure had actually occurred, 501 U.S. at 437, 111 S.Ct. 2382, the Court noted that the appropriate inquiry for determining whether a seizure had occurred in violation of the Fourth Amendment was "whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." 501 U.S. at 436, 111 S.Ct. 2382. Thus, *Bostick* does **not** stand for the proposition that seizures cannot occur within the confines of a bus where the driver has given an agent permission to commandeer the vehicle. Rather, *Bostick* stands for the well-settled proposition that, in determining whether a seizure has occurred for purposes of a Fourth Amendment analysis under federal law, all of the circumstances attendant to the encounter must be examined.

¶ 13 Whether the stop of the bus by Agent Paret is analyzed under those opinions discussing the constitutional constraints imposed by the Pennsylvania Constitution upon roadblocks, or analyzed under those cases determining the constitutionality of "interactions" between citizens and government agents in airport terminals and railway stations, the decisions of our Supreme Court[5] firmly establish that there was a "seizure" of the bus in the instant case, and that that seizure was a violation of the constitutional rights guaranteed to the citizens of this Commonwealth by Article I, Section 8 of the Pennsylvania Constitution, rendering the evidence seized subject to suppression.

> "When [a] police [officer] stop[s] a vehicle in this Commonwealth for investigatory purposes, the vehicle, and its occupants, are considered 'seized' and this seizure is subject to constitutional constraints." *Commonwealth v. Knotts,* 444 Pa.Super. 60, 663 A.2d 216, 218 (1995) (citation omitted).

*Commonwealth v. Bowersox,* 450 Pa.Super. 176, 675 A.2d 718, 720–721 (1996). *Accord: Commonwealth v. Riley,* 715 A.2d 1131, 1135 (Pa.Super.1998).

¶ 14 Our Supreme Court has defined the term "seizure" for purposes of analyzing a challenge under Article I, Section 8, much differently than the United States Supreme Court has defined "seizure" for purposes of Fourth Amendment analysis. *See: Commonwealth v. Hawkins,* 553 Pa. 76, 718 A.2d 265 (1998). Our Supreme Court, in an opinion by the eminent Justice Ralph J. Cappy[6] in *Commonwealth v.*

---

**5.** Our Supreme Court, cognizant of its sacred trust, has repeatedly rejected attempts by this Court to override, in the name of the war against crime, the privacy rights guaranteed to the citizens of this Commonwealth by Article I, Section 8. *See, e.g.: Commonwealth v. Hawkins,* 553 Pa. 76, 84–86, 718 A.2d 265, 269 (1998)("The polestar of the expanded protections afforded by Article I, Section 8, which distinguishes it from its federal counterpart, is its emphasis upon personal privacy interests."); *Commonwealth v. Rodriquez, supra* at 71, 614 A.2d at 1382 (Supreme Court rejected as unconstitutional under Article I,

Section 8 the Superior Court's theory of "justifiable detention"); *Commonwealth v. Lovette,* 498 Pa. 665, 676, 450 A.2d 975, 980 (1982), *cert. denied,* 459 U.S. 1178, 103 S.Ct. 830, 74 L.Ed.2d 1025 (1983)(Supreme Court rejects "investigative purposes" theory of Commonwealth, noting that "[t]he instant factual situation is also illustrative of the uncertainties attendant to any attempt to expand the *Terry* exception and reinforces the wisdom of scrupulously adhering to the narrow scope of the exception.")

**6.** Only Castille, J., dissented.

*Matos,* 543 Pa. 449, 672 A.2d 769 (1996), addressed, in three consolidated cases, the issue of whether contraband, discarded by an individual fleeing from a police officer, was the fruit of an illegal "seizure" where the officer possessed neither probable cause nor reasonable suspicion to stop the individual. The Court acknowledged that there had been **no** seizure under a Fourth Amendment analysis, citing *California v. Hodari D.,* 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991), but held that:

> ... this Court has traditionally regarded Article I, Section 8 as providing different, and broader, protections than its federal counterpart.

In *Edmunds,* this Court thoroughly examined the history of Article I, Section 8, and noted that this constitutional provision had its origin **prior** to the Fourth Amendment, in Clause 10 of the original Constitution of 1776. The Court also recognized that the modern version of Article I, Section 8 has remained untouched for over 200 years, and examined this significance:

> [T]he survival of the language now employed in Article I, Section 8 through over 200 years of profound change in other areas demonstrates that the paramount concern for privacy first adopted as part of our organic law in 1776 continues to enjoy the mandate of the people of this Commonwealth.

\* \* \* \*

> ... "[A]s this Court has stated repeatedly in interpreting Article I, Section 8, that provision is meant to embody a strong notion of privacy, carefully safeguarded in this Commonwealth for the past two centuries." *Id.* The Court then concluded that the purpose of the exclusionary rule as developed in Pennsylvania was not solely to deter police conduct, as the United States Supreme Court had interpreted it, but rather was **"unshakably linked to a right of privacy in this Commonwealth."** 526 Pa. at 397, 586 A.2d at 898 [emphasis added].

\* \* \* \*

... the law of this Commonwealth has always maintained a strong preference for the rights of the individual in the face of coercive state action. Through our decisions in *Commonwealth v. Hicks,* 434 Pa. 153, 253 A.2d 276 (1969), *Commonwealth v. Jeffries,* 454 Pa. 320, 311 A.2d 914 (1973), *Commonwealth v. Jones,* 474 Pa. 364, 378 A.2d 835 (1977), [*cert. denied,* 435 U.S. 947, 98 S.Ct. 1533, 55 L.Ed.2d 546 (1978)], and *Commonwealth v. Barnett,* 484 Pa. 211, 398 A.2d 1019 (1979), this Court, both in coordination with and independent of the federal courts, has set forth the standards to be applied in determining whether an individual is seized and whether the seizure is lawful; and if it is not lawful, whether any evidence obtained must be suppressed.

... In *Jones,* this Court adopted an objective standard for determining what amount of force constitutes the initiation of a *Terry* stop: "whether a reasonable [person] innocent of any crime, would have thought he was being restrained had he been in the defendant's shoes." 474 Pa. at 373, 378 A.2d at 840. This case, which **preceded** the United States Supreme Court's decision in *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), was a precursor to the so-called *"Mendenhall"* test posited by the United States Supreme Court: "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed he was not free to leave." 446 U.S. at 555, 100 S.Ct. at 1877, 64 L.Ed.2d at 509.

The *Jones/Mendenhall* standard has since been consistently followed in Pennsylvania in determining whether the conduct of the police amounts to a seizure or whether there is simply a mere encounter between citizen and police officer. *See, e.g., Commonwealth v. Lo-*

*vette,* 498 Pa. 665, 450 A.2d 975 (1982), *cert. denied,* 459 U.S. 1178, 103 S.Ct. 830, 74 L.Ed.2d 1025 (1983); *Commonwealth v. Hall,* 475 Pa. 482, 380 A.2d 1238 (1977); *Commonwealth v. Brown,* 388 Pa.Super. 187, 565 A.2d 177 (1989); *Commonwealth v. Bulling,* 331 Pa.Super. 84, 480 A.2d 254 (1984). *Commonwealth v. Carroll,* 427 Pa.Super. 1, 628 A.2d 398 (1993)(Johnson, J., dissenting). *See also Commonwealth v. Lewis,* 535 Pa. 501, 636 A.2d 619 (1994)....

\* \* \* \*

Thus, there exists clear precedent in Pennsylvania defining the appropriate standards to be used when considering whether an individual has been seized. The long-standing definition of what constitutes a seizure applied by the Courts of this Commonwealth cannot be ignored, particularly when viewed in tandem with this Court's recognition of the privacy rights embodied in Article I, Section 8.

\* \* \* \*

Less than three years ago, this Court, in *Commonwealth v. Rodriquez, supra,* rejected the contention that the goal of curtailing the drug trade permits the expansion of police intrusion without the constitutional justification of reasonable suspicion or probable cause:

> We emphatically reject the Superior Court's "end justifies the means" analysis. By focusing its attention only upon the serious ills inflicted upon society by illegal narcotics, the Superior Court failed to recognize and respond to necessary constitutional constraints on excessive police conduct. The seriousness of criminal activity under investigation, whether it is the sale of drugs or the commission of a violent crime, can never be used as justification for ignoring or abandoning the constitutional right of every individual in this Commonwealth to be free from intrusions upon his or her personal liberty absent probable cause.

Accordingly, we decline to adopt the rationale of the Superior Court or the arguments offered by the Commonwealth, and thus, we decline to expand the appropriate narrow "reasonable suspicion" exception to probable cause already established by the United States Supreme Court in *Terry v. Ohio* and by this Court in *Commonwealth v. Hicks,* 434 Pa. 153, 253 A.2d 276 (1969).

532 Pa. at 73, 614 A.2d at 1383. As we declined to expand the reasonable suspicion exception in *Rodriquez* as contrary to the protections afforded by Article I, Section 8, so too does this Court decline to narrow the long-recognized definition of seizure by adopting the *Hodari D.* definition.

Thus, we find that there are ample policy reasons to reject the decision of the United States Supreme Court in *Hodari D.* as being inconsistent with the constitutional protections afforded under Article I, Section 8 of the Pennsylvania Constitution. As aptly put by Justices Stevens and Marshall, "[i]f carried to its logical conclusion, it will encourage unlawful displays of force that will frighten countless citizens into surrendering whatever privacy rights they may still have." 499 U.S. at 646–647, 111 S.Ct. at 1561, 113 L.Ed.2d at 710 (Stevens, J., dissenting).

*Commonwealth v. Matos, supra* at 453–463, 672 A.2d at 772–776 (footnote omitted).

¶ 15 Our Supreme Court, in *Commonwealth v. Whitmyer,* 542 Pa. 545, 668 A.2d 1113 (1995), reiterated the prohibition against the random stopping of vehicles on the highways of this Commonwealth:

> In *Commonwealth v. Swanger,* 453 Pa. 107, 307 A.2d 875 (1973), this Court addressed the issue of whether a police officer could stop the driver of an automobile without having observed that driver violate any of the provisions of the Vehicle Code. We first acknowledged that the stopping of a vehicle and

the detainment of its passengers constitutes a seizure and therefore implicates the Fourth Amendment ... [and] held that "before the government may single out one automobile to stop, there must be specific facts justifying this intrusion. To hold otherwise would be to give the police absolute, unreviewable discretion and authority to intrude into an individual's life for no cause whatsoever." *Id.*

\* \* \* \*

This Court [in *Commonwealth v. Murray*, 460 Pa. 53, 331 A.2d 414 (1975)] reversed the defendant's conviction on the basis that the evidence obtained from the search of the vehicle should have been suppressed because "the Commonwealth's power to regulate vehicular traffic within its borders did not supply an adequate justification for the intrusion upon privacy occasioned by the stop." *Id.* at 59, 331 A.2d at 417. In so holding, we reaffirmed the rule set forth in *Swanger*:

> If the alleged basis of a vehicular stop is to permit a determination whether there has been compliance with the Motor Vehicle Code of this Commonwealth, it is incumbent upon the officer to articulate specific facts possessed by him, at the time of the questioned stop, which would provide probable cause to believe that the vehicle or the driver was in violation of some provision of the Code.

*Id.* at 58–59, 331 A.2d at 416–17 (citing *Commonwealth v. Swanger*, 453 Pa. 107, 115, 307 A.2d 875, 879 (1973))(footnote omitted). .

\* \* \* \*

When previously faced with these two competing interests, we held "that a stop of a single vehicle is unreasonable where there is no outward sign the vehicle or the operator are in violation of The Vehicle Code.... [B]efore the government may single out one automobile to stop, there must be specific facts justifying this intrusion." *Common-*

*wealth v. Swanger*, 453 Pa. at 112, 307 A.2d at 878.

*Commonwealth v. Whitmyer, supra* at 547–553, 668 A.2d at 1115–1117. *See also: Commonwealth v. DeWitt, supra* at 306–307, 608 A.2d at 1034; *Commonwealth v. Scavello*, 703 A.2d 36, 38 (Pa.Super.1997), *appeal granted* (October 30, 1998).

¶ 16 Recently, this Court, in *Commonwealth v. Yashinski, supra*, 723 A.2d at 1042–1043, concluded that the defendant had been seized, in violation of Article I, Section 8, when:

> ... Trooper Gibson and his partner systematically engaged the drivers entering the turnpike in conversation. This brief encounter, at least in the case of our appellant, and presumably with most, if not all, of the other drivers entering the turnpike, provided the Trooper sufficient enough contact with the appellant to presumptively determine that he might be operating the vehicle under the influence of alcohol. The lower court may have been inclined to believe the rather incredulous explanation of Trooper Gibson that, in systematically engaging drivers in conversation, he and his partner were performing "public relations" activities for the Pennsylvania State Police as opposed to seeking drunk drivers. Nevertheless, in our opinion such a course of conduct describes a *de facto* roadblock regardless of intent.

A "roadblock" has been characterized as a "systematic program of checking vehicles or drivers." 75 Pa.C.S. § 6308(b). Further, our Supreme Court, in discussing the case of *United States v. Martinez–Fuerte*, 428 U.S. 543, 96 S.Ct. 3074 [49 L.Ed.2d 1116] (1976), used the following language to describe conduct which was considered a roadblock in that case, the "routine stopping of a vehicle for brief questioning of its occupants...." *Commonwealth v. Tarbert*, 517 Pa. 277, 287, 535 A.2d 1035, 1040 (1987). Regardless of intent and/or the presence of reasonable suspicion, or the

lack thereof, this is precisely what Trooper Gibson was engaged in.

As mentioned earlier, Gibson testified that as appellant stopped to take a ticket he asked him "how he was doing, or where are you coming from." Gibson further indicated that appellant wasn't the only individual he engaged in this fashion, rather Gibson stated "I speak to just about everyone that goes through." As such, Gibson and his partner were engaged in a process of the "routine stopping of a vehicle for brief questioning of its occupants." The Commonwealth and the lower court are quick to point out that Trooper Gibson never ordered appellant to stop and never indicated that he was not free to leave. However, in our opinion this is immaterial.

The definition of a roadblock does not state that the systematic checking must be done under a threat of force or some other form of compulsion. To the extent the questioning of drivers coming through the tollbooths effectively provided brief contact with most of them it would serve the same purpose. Further, this argument ignores the reality of the circumstances. The overwhelming majority of lay people do not feel free to simply ignore a police officer's questions and continue driving along. We recognized a similar concept in *Commonwealth v. Zogby*, [455 Pa.Super. 621] 689 A.2d 280 (1997), where we stated "[t]he reality of the matter is that when a police officer requests a civilian to do something, even something as simple as 'move along,' it is most often perceived as a command that will be met with an unpleasant response if disobeyed." *Id.*, 689 A.2d at 282.

No less an authority than Justice Stevens of the United States Supreme Court has stated "[r]epeated decisions by ordinary citizens to surrender that interest [the right to refuse consent to a search] cannot be satisfactorily explained on any hypothesis other than an assumption that they believed they had a legal duty to do so." *Ohio v. Robinette*, 519 U.S. 33, 48, 117 S.Ct. 417, 425 [136 L.Ed.2d 347] (1996)(Dissenting Opinion). These observations demonstrate that a police officer need not officially "stop" a vehicle to effectuate the investigative purpose, it is enough if they ask a question of a motorist because, except for the brashest of motorists, the ordinary motorist will feel compelled to stop and respond.

*Commonwealth v. Yashinski, supra* at 1043.

¶ 17 While the United States Supreme Court in a plurality decision in *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), concluded that an encounter between a citizen and a DEA agent in an airport terminal had not constituted an investigatory detention under federal law, the Court noted that encounters between officers walking upon streets or in the public concourses of air, rail and bus terminals are inherently different from encounters between government agents initiated by the stop of a vehicle and its passengers:

> The Court's decisions involving investigatory stops of automobiles do not point in any different direction. In *United States v. Brignoni–Ponce*, 422 U.S. 873 [95 S.Ct. 2574, 45 L.Ed.2d 607], the Court held that a roving patrol of law enforcement officers could stop motorists in the general area of an international border for brief inquiry into their residence status **only** if the officers reasonably suspected that the vehicle might contain aliens who were illegally in the country. *Id.*, at 881–882 [95 S.Ct. 2574]. The Government did not contend in that case that the persons whose automobiles were detained were not seized. Indeed, the Government acknowledged that the occupants of a detained vehicle were required to respond to the officers' questions and on some occasions to produce documents evidencing their eligibility to be in the United States. *Id.*, at 880 [95 S.Ct. 2574]. Moreover, **stopping or diverting an automobile in transit, with**

**the attendant opportunity for a visual inspection of areas of the passenger compartment not otherwise observable**, is materially more intrusive than a question put to a passing pedestrian, and **the fact that the former amounts to a seizure** tells very little about the constitutional status of the latter. *See also Delaware v. Prouse*, 440 U.S. 648 [99 S.Ct. 1391, 59 L.Ed.2d 660]; *United States v. Martinez–Fuerte*, 428 U.S. at 556–559 [96 S.Ct. 3074].

*United States v. Mendenhall, supra*, 446 U.S. at 556–557, 100 S.Ct. 1870 (emphasis added).

 ¶ 18 Our esteemed colleagues of the dissent and the learned trial court reason that the cooperation of Mr. Prather, the bus driver, obviates the need to analyze the stop of the bus under the substantial body of case law [7] prohibiting the random stopping of vehicles, as the stop was consensual. While we refuse to find that Mr. Prather could provide a valid consent for the unconstitutional seizure of any passenger on his bus, the seizure in this case cannot pass constitutional muster even when we examine—in isolation—only the interaction between Agent Paret and appellant **after** the seizure of the bus had been completed by its removal to an area alongside the toll plaza.

¶ 19 Superintendent Tilwick of the Delaware River Toll Bridge Commission testified at trial that no one could leave the bus and walk or hitchhike from the area where it had been directed by the agents, since pedestrians are prohibited upon Route 80.[8] Thus the grounds usually urged upon this Court by the Commonwealth in support of its claim that there was no seizure, *i.e.*, that the suspect was free to decline to

---

7. The United States Supreme Court in *United States v. Brignoni–Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), held that a roving patrol of law enforcement officers could not stop motorists in the general area of an international border for brief inquiry into their residence status if the officers did not have a reasonable, articulable suspicion that the vehicle might contain aliens who were illegally in the country. The Court held: "it is not 'reasonable' under the Fourth Amendment to make such stops on a random basis…. For the same reasons that the Fourth Amendment forbids stopping vehicles at random to inquire if they are carrying aliens who are illegally in the country, it also forbids stopping or detaining persons for questioning about their citizenship on less than a reasonable suspicion that they may be aliens." 422 U.S. at 883–884, 95 S.Ct. 2574. Similarly, the Supreme Court in *Reid v. Georgia*, 448 U.S. 438, 439, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980), reversed the conviction of an airline passenger where the agent asked two men outside the airport terminal "if they would agree to return to the terminal and to consent to a search of their persons and their shoulder bags. The agent testified that the petitioner nodded his head affirmatively, and that the other responded, 'Yeah, okay.' As the three of them entered the terminal, however, the petitioner began to run and before he was apprehended, abandoned his shoulder bag. The bag, when recovered, was found to contain cocaine." *Reid v. Georgia, supra*. The *Reid* Court held:

The Fourth and Fourteenth Amendments' prohibition of searches and seizures that are not supported by some objective justification governs all seizures of the person, "including seizures that involve only a brief detention short of traditional arrest. *Davis v. Mississippi*, 394 U.S. 721 [89 S.Ct. 1394, 22 L.Ed.2d 676] (1969); *Terry v. Ohio*, 392 U.S. 1, 16–19 [88 S.Ct. 1868, 20 L.Ed.2d 889] (1968)." *United States v. Brignoni–Ponce*, 422 U.S. 873, 878, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). While the Court has recognized that in some circumstances a person may be detained briefly, without probable cause to arrest him, **any curtailment of a person's liberty** by the police must be supported at least by a reasonable and articulable suspicion that the person seized is engaged in criminal activity. *See Brown v. Texas*, 443 U.S. 47, 51, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979); *Delaware v. Prouse*, 440 U.S. 648, 661, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); *United States v. Brignoni–Ponce, supra; Adams v. Williams*, 407 U.S. 143, 146–149, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); *Terry v. Ohio, supra. Reid v. Georgia*, 448 U.S. at 440, 100 S.Ct. 2752 (emphasis supplied).

8. This may provide an explanation for the move by officer Paret from the former practice of boarding buses during scheduled stops and layovers. *Commonwealth v. Holt*, 711 A.2d 1011 (Pa.Super.1998); *Commonwealth v. Vasquez*, 703 A.2d 25 (Pa.Super.1997); *Commonwealth v. Wright*, 448 Pa.Super. 621, 672 A.2d 826 (1996).

answer or to walk away [9], is not available in this case and precludes any finding other than that "officer [Paret] by means of ... show of authority, has ... restrained the liberty of [appellant] requiring that we conclude that a 'seizure' has occurred". *Bostick*, 501 U.S. at 434, 111 S.Ct. 2382. *See also: Commonwealth v. Matos, supra* at 457, 672 A.2d 769, 672 A.2d at 774. Moreover, in light of the announcements made by the agent and the driver after pulling the bus over, no "reasonable man, innocent of any crime, would have thought he was [not] being restrained." *Commonwealth v. Jones, supra* at 373, 378 A.2d at 840, quoting *United States v. McKethan*, 247 F.Supp. 324, 328 (D.D.C.1965)(footnote omitted).

¶ 20 The venerable Justice Stephen A. Zappala, writing for the majority [10] in *Commonwealth v. Lewis, supra*, specifically rejected this Court's prior determination that there had not been an investiga-

tory stop of the defendant in a public railway terminal, and reminded this Court that:

... "No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." *Terry v. Ohio, supra*, 392 U.S. at 8, 88 S.Ct. at 1873, citing *Union Pac. R. Co. v. Botsford*, 141 U.S. 250, 251, 11 S.Ct. 1000, 1001, 35 L.Ed. 734 (1891). The Fourth Amendment's prohibition of searches and seizures that are unsupported by objective justification governs all seizures of the person, including seizures that involve only a brief detention.

*Commonwealth v. Lewis, supra* at 507, 636 A.2d at 622. The *Lewis* Court analyzed the decision of the United States Supreme Court in *Bostick* and found, under the totality of the circumstances, that the encounter in the railway station [11] between

9. As our learned colleague, Judge John G. Brosky, has astutely reiterated:

> ...it must be remembered that a police officer is an authority figure and that an officer's authority is commonly reinforced when encountering a 'suspect.' For instance, if a driver is stopped under suspicion of a simple traffic violation the driver may be asked for a driver's license and registration, or may be asked to step out of the vehicle. These requests are not postured in such a way as to suggest one is given a real choice to comply or not. As stated by the Supreme Court of Ohio, '[m]ost people believe that they are validly in a police officer's custody as long as the officer continues to interrogate them. The police officer retains the upper hand and the accouterments of authority. That the officer lacks legal license to continue to detain them is unknown to most citizens, and a reasonable person would not feel free to walk away as the officer continues to address him.' *State v. Robinette*, 73 Ohio St.3d 650, 655, 653 N.E.2d 695, 698 (1995). Reversed on federal constitutional grounds, *Ohio v. Robinette*, 519 U.S. 33, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996).

> *Commonwealth v. Zogby, supra*, 689 A.2d at 282 (footnote omitted).

10. Justices Montemuro and Papadakos agreed with the conclusion of the majority that a seizure had occurred, but disagreed

with the finding that there was no reasonable suspicion to justify the investigatory stop.

11. An Amtrak ticket agent had advised an Amtrak police officer that two black men, fitting a drug courier profile, who had previously purchased round trip tickets to New York with cash, had again purchased tickets and "had a bundle of money and ... no luggage." The officers observed the men as they awaited their train and decided to meet the train on its return and to approach the men at that time:

> When the Appellants returned, they were confronted by four officers – Officer Ciupinski and his partner, Officer Crandall, Detective Holland and his partner, Detective Arnold. Officer Ciupinski and Detective Holland stood side by side. Their partners followed behind them to act as backup. None of the officers were in uniform. The officers identified themselves and informed the appellants that they were "working narcotics and doing an interdiction program checking for couriers bringing drugs back from New York."

> The officers asked whether the Appellants would mind speaking with them. The Appellants then backed away and the four officers followed. They continued to back away for five to ten feet until they were backed up to a wall with benches in front. They remained standing until backed up to the benches.

Lewis and the officers had constituted an investigatory stop and not a mere encounter:

> In *Florida v. Bostick*, 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991), the Court addressed the issue whether the Fourth Amendment permits police officers to approach individuals on a bus to ask them questions and to request consent to search their luggage. As part of a drug interdiction program, the Sheriff's Department of Broward County, Florida, routinely boarded buses at **scheduled stops** and asked passengers for permission to search their luggage. Two officers boarded a bus bound from Miami to Atlanta **during a stopover** in Fort Lauderdale. The officers singled out Terrance Bostick, concededly without any articulable suspicion, and asked to inspect his ticket and identification. The ticket matched Bostick's identification. The officers then conducted a search of his suitcase and uncovered cocaine. There was a dispute as to whether Bostick consented to the search. Bostick was arrested and charged with trafficking in cocaine.
>
> The trial court denied his suppression motion. The Florida District Court of Appeal affirmed and certified the question to the Florida Supreme Court. The Florida Supreme Court held that an impermissible seizure occurs when police initiate a drug search on buses **during scheduled stops** and question passengers without articulable reasons for doing so. The U.S. Supreme Court granted certiorari to determine whether the Florida Supreme Court's per se rule was consistent with its Fourth Amendment jurisprudence.
>
> The U.S. Supreme Court held that the Florida Supreme Court erred in adopting a per se rule that every police encounter on a bus is a seizure. The Court held that a seizure does not occur simply because a police officer approaches an individual for the purpose of asking a few questions so long as a

*Commonwealth v. Lewis, supra* at 504–508,

reasonable person would feel free to ignore the police and go about his business. Encounters of that nature are consensual and no reasonable suspicion is required. The Court expressly refused to decide whether or not a seizure of Bostick had occurred because the trial court had made no express findings of fact and the Florida Supreme Court's decision rested entirely on the fact that the encounter took place on a bus. The Court remanded the matter for further proceedings consistent with its opinion. The U.S. Supreme Court articulated the following test to determine whether a particular encounter constitutes a seizure: "[A] court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' request or otherwise terminate the encounter." 501 U.S. at 439, 111 S.Ct. at 2389. Applying the test to the facts of the instant case, we find that under the totality of the circumstances, the police conduct would have communicated to a reasonable person that the person was not free to leave. It is not our intention to single out the fact that the Appellants were confronted by four police officers as dispositive of our inquiry, but the nature of the confrontation demonstrated a show of authority which constituted a restraint of the Appellants' liberty. We hold that a seizure occurred in this case.

*Commonwealth v. Lewis, supra* at 508–509, 636 A.2d at 623 (emphasis added).

¶ 21 A majority of this Court *en banc* in *Commonwealth v. Hoak*, 700 A.2d 1263 (Pa.Super.1997), *appeal granted*, 555 Pa. 717, 724 A.2d 933 (1998), held that:

> ... In this Commonwealth, pedestrians and motorists alike are protected by the same constitutions. The inquiry into whether a particular encounter constitutes a seizure must consider all the surrounding circumstances to determine

636 A.2d at 621–622.

whether police conduct would have communicated to reasonable persons that they were not free to decline the officer's request or otherwise terminate the encounter. This inquiry applies to encounters that take place on a city street or a bus, in an airport lobby or along the road following a traffic stop. *See Bostick,* 501 U.S. at 439–40, 111 S.Ct. at 2389 (whether questioning aboard a bus constitutes a seizure requires a consideration of all the circumstances surrounding the encounter); *Robinette II,* 519 U.S. at 38–40, 117 S.Ct. at 421 (whether consent to search during a lawful seizure is valid is question of fact to be determined from all the circumstances).

*Commonwealth v. Hoak, supra,* 700 A.2d at 1268. The majority in *Hoak* held that Hoak, who had been told he was free to leave after a traffic stop, was no longer "seized" for purposes of Fourth Amendment jurisprudence since his papers had been returned to him and he had been informed that he was free to leave prior to the officer's request.

... This court has held [motorists] cannot consent while the officer holds their identification. *Commonwealth v. Lopez,* 415 Pa.Super. 252, 609 A.2d 177, *alloc. denied,* 533 Pa. 598, 617 A.2d 1273 (1992). Appellant now asks us to hold they cannot consent after their identification is returned and they are told they are free to go....

* * * *

... As the discussion in *Lopez* indicates, whether police return or retain a person's license, registration or other papers is critical to properly resolving the issue raised herein.

In *Lopez,* police validly stopped Lopez for a traffic violation. **Without** returning his registration, rental car agreement and license, police continued to question Lopez regarding his origin, destination, purpose and duration of his trip, and then asked for his consent to search. A panel of this court found this "continued detention and investigation" an unreasonable Fourth Amendment

seizure. *Lopez,* 415 Pa.Super. at 262, 609 A.2d at 182. The illegality resulted from the officer's retention of Lopez's license and other papers because while police held his license, Lopez was plainly **not** free to leave; indeed, he could not do so legally.

* * * *

While the paperwork during the traffic stops in *Lopez* and *Guzman* had been concluded, neither individual was free to leave, given the objective facts including police retention of license and registration. Neither individual was **advised** he was free to leave. Neither individual's encounter with police was transformed from nonconsensual (initiated by their illegal driving) to consensual. Clearly, *Lopez* and *Guzman* are not just distinguishable from the instant case, they emphasize two factors we agree are telling: retention of necessary documents, and absence of a statement indicating they were free to leave.

*Commonwealth v. Hoak, supra,* 700 A.2d at 1267, 1269, 1270 (emphasis in original)(footnote omitted).

¶ 22 In a closely related case, an equally divided Supreme Court in *Commonwealth v. Sierra, supra,* affirmed the suppression of evidence seized pursuant to a consent to search given **after** the driver had been given a warning and **all** of his documentation had been returned.

¶ 23 The Supreme Court had granted allocatur in *Sierra* to examine three issues: "(1) whether Officer Roehm's continued questioning of the driver regarding the contents of the car constituted an investigative detention; (2) if so, whether the detention was justified; and (3) if there was an illegal detention, whether the driver's subsequent consent to search the vehicle and the pat-down search of appellee were tainted by the illegal detention." *Commonwealth v. Sierra, supra* at ——, 723 A.2d. at 645–646. Justice Nigro in his Opinion in Support of Affirmance, held:

An investigative detention occurs when a police officer temporarily detains an in-

dividual by means of physical force or a show of authority for investigative purposes. *Commonwealth v. Lopez,* 415 Pa.Super. 252, 258, 609 A.2d 177, 180, *appeal denied,* 533 Pa. 598, 617 A.2d 1273 (1992). *See also Commonwealth v. Lewis,* 535 Pa. 501, 636 A.2d 619 (1994). Such a detention constitutes a seizure of a person and thus activates the protections of the Fourth Amendment and the requirements of *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *Lopez,* 415 Pa.Super. at 258–59, 609 A.2d at 180; *Lewis,* 535 Pa. at 507–08, 636 A.2d at 622–23. In order to determine whether a particular encounter constitutes a seizure/detention, "a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' request or otherwise terminate the encounter." *Lewis,* 535 Pa. at 509, 636 A.2d at 623 (quoting *Florida v. Bostick,* 501 U.S. 429, 439, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991)).

In the present case, the Commonwealth argues that the officer's questioning cannot be characterized as an investigative detention because Officer Roehm had returned the driver's license and registration and had issued a warning for speeding prior to asking any questions of the driver, because there was no show of physical force or authority over the driver, and because the question asked by Officer Roehm was not a request to search the vehicle.

Given the circumstances surrounding the encounter, we cannot agree that the occupants should have known that they could depart once the officer returned the driver's documentation and issued the warning....
*Commonwealth v. Sierra, supra* at ——, 723 A.2d at 646.

¶ 24 In light of the Supreme Court's Opinions in *Sierra,* and of, as well, the unanimous *en banc* view of this Court in *Hoak* that a valid consent to search cannot be supplied by a motorist who has **not** been told he may leave and whose documents have **not** been returned by the officer, it cannot reasonably be argued that a passenger on a bus, seized while en route on an interstate highway where pedestrian traffic is prohibited, who has been informed by the driver of the bus (as he leaves the bus to the sole control of the agents) that the bus has been temporarily placed at the disposal of "drug enforcement agents who are going to get up on the bus and they are going to just routinely go through the bus ... search it or whatever", could reasonably believe he was free to decline the agent's demands for his ticket, identification, itinerary, and luggage.

■ ¶ 25 The constitutional requirement of a reasonable articulable suspicion to support an investigative seizure " 'protects a precious right – hard earned and easily lost – to be free of arbitrary police intrusions on individual privacy and free movement.' " *Commonwealth v. Bennett,* 412 Pa.Super. 603, 604 A.2d 276, 286 (1992), quoting *United States v. Gooding,* 695 F.2d 78, 83–84 (4th Cir.1982). In the absence of such reasonable suspicion, the seizure in the instant case was a violation of the Pennsylvania Constitution requiring suppression of all evidence seized as a result thereof.[12]

**12.** One can but hope that further appellate review of the issues raised by this appeal will effect the adoption of the insightful proposal of Justice Russell M. Nigro that police officers be required to advise travelers as follows:

We are police officers investigating drug trafficking. We approached you on a purely random basis and would like to ask you some questions. You have a legal right to decline our requests, a right to refuse to cooperate, and you are free to leave. If you choose not to leave and to comply with our requests, anything revealed through those inquires may be used against you in legal proceedings. Furthermore, if you agree to cooperate at the outset, you may still refuse at any time to cooperate further; you may end the inquiry and leave. Do you understand that you are under no obligation to comply with our requests at this time?

¶ 26 Judgment of sentence vacated. Case remanded. Jurisdiction relinquished.

**¶ 27 EAKIN, J., FILES A DISSENTING OPINION, JOINED BY JOYCE, J., AND LALLY–GREEN, J.**

**¶ 28 STEVENS, J., FILES A DISSENTING OPINION, JOINED BY EAKIN, J., AND LALLY–GREEN, J.**

EAKIN, J., dissenting:

¶ 1 The majority provides a fine compilation of Fourth Amendment caselaw and the dangers of overzealous government agents; however, I cannot find any fact in this suppression record which constitutes an unconstitutional act. As such, I am compelled to dissent, joining as well the thoughtful dissent of Judge Stevens. No matter how distasteful one finds the notion of interdiction techniques,[13] if this agent did nothing improper, there is no basis for overturning the suppression court's decision.

¶ 2 I believe the majority errs factually[14] and legally at the outset of its analysis, by calling this a stop. It is not a stop in search and seizure terms, but an encounter. It was a planned encounter to be sure, but the bus was already at rest, on its own, at the time the agent approached the driver. The agent did not stop it by approaching the driver. Cases such as *Commonwealth v. Swanger*, 453 Pa. 107, 307 A.2d 875 (1973) and *Commonwealth v. Whitmyer*, 542 Pa. 545, 668 A.2d 1113 (1995), cited at length by the majority, are not applicable to the approach of a vehicle already at rest without police intervention.

¶ 3 There is no illegality in the request for the driver's cooperation – an officer may always ask, if lawfully in position to do so. Only if the request is under coercive circumstances which preclude voluntary consent will the request be constitutionally invalid.[15] The agent did not ask for the driver's documents at this point,

*Commonwealth v. Boswell*, 554 Pa. 275, 292 n. 1, 721 A.2d 336, 344 n. 1 (1998)(Opinion in Support of Reversal). Such a statement should, of course, be read from a card so as to enhance the credibility of the transit police that the full statement was recited to the accused. The transit police will likely urge that imposition of such a requirement will inhibit their effort and impede their march. This assertion echoes, of course, the dire predictions of law enforcement authorities when the *Miranda* warnings became a requirement, but few today would dispute that our Constitutions have been well served by those warnings. It merits mention that the requirement of such a statement by the transit police would not simply prevent the erosion of our individual liberties but would, as well, diminish the ever increasing inventory of suppression cases which burden our judicial system. Nor do we address what some characterize as the distressing inclination of the transit police to depict such bus encounters as a *jolly holiday with Mary Poppins*, and even reshape their recollection of events of the encounter so as to thwart the suppression effort.

13. This vantage point causes the majority to emphasize constitutional red herrings. For example, the majority stresses the practical restraints on appellant's ability to "walk away." This question is illusory; if he was not able to walk away, it was because he decided to leave the driving to Greyhound – that's the choice which put him, quite voluntarily, in the confines of a bus in the "wilds"

of Monroe County. The proper constitutional analysis examines police conduct, not circumstances created by appellant's choice of transportation. The only reason he could possibly have to think his trip wouldn't continue involved the potential discovery of the cocaine, not the location of the bus.

14. When reviewing the denial of a suppression motion, we must determine whether the record supports the suppression court's factual findings, and if it does, we may reverse only for legal error. *Commonwealth v. Abdul–Salaam*, 544 Pa. 514, 678 A.2d 342, 347 (1996), *cert. denied*, 520 U.S. 1157, 117 S.Ct. 1337, 137 L.Ed.2d 496 (1997). While I do not suggest a desire to reach a certain result no matter the suppression record, the majority specifically declines to apply this standard to the facts found by the suppression court, then cites testimony from trial and the facts from other cases to support its analysis of what are entirely suppression issues.

15. *See Commonwealth v. Lopez*, 415 Pa.Super. 252, 609 A.2d 177 (1992). The majority also suggests our *en banc* decision in *Commonwealth v. Hoak*, 700 A.2d 1263 (Pa.Super.1997) holds a valid consent to search cannot be supplied by a motorist who has not been told he may leave and whose documents have not been returned. I believe this is an incorrect reading of *Hoak*. *Hoak* holds that if the documents are returned and the individual is told he may leave, there is no coercion –

nor did he suggest any penalty for declining cooperation. Company policy gave the driver discretion to decline cooperation, which means he *knew* he didn't have to agree. The driver did agree, and unless we hold an agent's identity is *per se* coercive, his agreement was not involuntary.

¶ 4 There is no "common carrier" exception to consent considerations, nor is there logic for one. The same constitutional law applies to all vehicles; the driver of a bus has the same constitutional rights as the driver of a car, no more, no less. Likewise, the passengers of a bus, having surrendered to the driver the decision of which route to take, whether to stop, go, speed up or slow down, to pay the toll or drive through the booth, are in the same position as passengers of a car. If the driver agrees to stop, the passengers cannot complain their rights are violated. If the driver allows the officer to ride along, the passengers cannot complain. If the driver consents to a search of a vehicle in his possession, the passengers cannot complain until the search reaches items in their individual control.

¶ 5 At the point the driver agreed to pull to the side, the agent had done nothing which violated the rights of the driver or the passengers. The subsequent words of the driver to the passengers, twice quoted by the majority, may be relevant to the subjective thoughts of the passengers, but our issue is determined from an objective standard, focusing solely on the conduct of police. *Hoak, supra.* These were not the words of the police, nor were they the words of an agent of the police, and comprised no governmental action, much less illegality. No matter what the driver told passengers, if done without a police request or coercion, there is no constitutional significance to these words.

¶ 6 I can find no illegality to the point the police entered the bus. Inside, they conducted relevant searches of two bags. The first was on the floor; appellant acknowledged it was his, and consented to revealing its contents, a pair of sneakers. As the officer was lawfully in a position to ask, and the cooperation was not based on any articulable coercion beyond the officer's occupation, I find no impropriety in that search.

¶ 7 The second bag was in the luggage rack. When the agent asked for its owner, no one acknowledged it. With no owner, did appellant have possession? Where is the illegality in searching a bag with no owner? At that point the driver, in control of the bus and its contents, certainly had possession equal to anyone else, and he consented to its search.

¶ 8 At this juncture, appellant was between a rock and a hard place, but that position was not the result of police illegality—his dilemma was the result of knowing the contents of the second bag. He had every right to claim possession and deny permission to search; his rejection of this option was understandable, for it would tie him to the cocaine. He also had the right to say nothing, to tacitly deny ownership; while this kept him from being able to deny permission to search, it did not connect him to the drugs. His decision was made difficult by what was in the bag, not by police illegality. The first choice was not appealing; the alternative left the bag unclaimed and searchable. Having to choose between a rock and a hard place does not make appellant's choice coerced.

¶ 9 I believe the majority rightly expresses concern about governmental overreaction in the "war on drugs," [16] but in

---

*Hoak* did not create a requirement that consent is invalid absent a *Miranda*-like warning. *Hoak* repeatedly states the issue of coerced consent turns on the individual facts of a case, and rejects such a bright-line rule.

16. Coined as a political buzzword to justify aggressive enforcement tactics, the phrase "war on drugs," is now invoked more as a derogatory euphemism, used to shroud all proactive police techniques with an umbrella of suspicion. Called a war years ago, in reality it has never been more than a series of skirmishes. We must evaluate each case on its facts, instead of letting the term "war" become a hobgoblin fogging our analysis in either direction.

turn overreacts to the facts of this case. This bus was not stopped by police. If "seized," it was with the uncoerced consent of someone clearly allowed to consent. The pressure inside the bus came from appellant's knowledge of the contents of the bag he chose to disavow. If examined step by step, there simply is no police impropriety in the events of this day. While the majority gives us a compelling reminder of the need to guard against governmental impropriety, the manifest dislike of the technique used here obscures the fact there simply was no unconstitutional conduct.

¶ 10 Accordingly, I dissent.

¶ 11 JOYCE and LALLY–GREEN, JJ. join the Dissenting Opinion by EAKIN, J.

STEVENS, J., dissenting:

¶ 1 The sweeping conclusions and far-reaching effects of the Majority Opinion, however well intentioned, strike a serious blow to the legitimate actions of law enforcement drug interdiction teams. Indeed, the Majority Opinion essentially opens the doors of public transportation to drug traffickers, removing any fear that law enforcement officers will be allowed to engage in even a constitutional mere encounter with passengers.

¶ 2 Instead of hindering law enforcement and rendering Pennsylvania's highway system a drug freeway, I would find that an analysis of the facts of record and the applicable case law show that the actions of the law enforcement officers here did not rise above the level of a mere encounter, and were, at all times, professional, appropriate, and consistent with constitutional principles. Moreover, I would find that the location of the mere encounter, i.e. a bus, did not render the interaction a "seizure," and I would conclude that Appellant's abandonment of the bag containing the cocaine was voluntary.

¶ 3 I would specifically find that under the circumstances of this case, the drug interdiction investigation performed on the bus in which Appellant rode did not constitute a seizure of Appellant, either within the meaning of the Fourth Amendment to the United States Constitution, or Article 1, Section 8 of the Pennsylvania Constitution.

¶ 4 My examination of the facts of this case reveals the following course of events:

¶ 5 Appellant, Marcus A. Wilmington, was convicted of possession with the intent to manufacture or deliver a controlled substance [17] and possession of a small amount of marijuana,[18] stemming from a December 11, 1996 narcotics interdiction investigation. On that date, Appellant was a passenger on a Greyhound bus travelling from New York to Cleveland on Interstate 80. Agent Ronald Paret, of the Pennsylvania Attorney General's Office, and Detective Kirk Schwartz, of the Monroe County District Attorney's Office, were conducting a narcotics interdiction operation at the Delaware Water Gap toll bridge with the permission of the superintendent of the Delaware River Toll Bridge Commission. N.T. 5/14/97 at 42. Agent Paret and Detective Schwartz were dressed in plain clothes, but wore jackets which identified them as law enforcement officers. N.T. 5/14/97 at 47. Both carried weapons concealed by their jackets. N.T. 5/14/97 at 47.

¶ 6 While Appellant's bus was stopped at a toll booth, Detective Schwartz asked its driver, Nat Prather, if he had a few minutes to allow a routine check. N.T. 5/14/97 at 12. Detective Schwartz did not order Mr. Prather to pull over, and Greyhound company policy gives its drivers discretion whether to pull over under such circumstances. N.T. 5/14/97 at 12. Mr. Prather testified before the lower court that if he was running late he could tell the police officers that he didn't have time to stop, but he was not running late that day and agreed to the check. N.T. 5/14/97 at 12, 13, 16. Mr. Prather then moved the bus out of the lane of travel to let traffic pass, parking it in the pull-off immediately be-

---

**17.** 35 P.S. § 780–113(a)(30).

**18.** 35 P.S. § 780–113(a)(31).

yond the toll plaza, next to the public telephones. N.T. 5/14/97 at 20. Mr. Prather exited the bus, and Detective Schwartz and Agent Paret asked him to see the tickets which were collected as the passengers boarded the bus. N.T. 5/14/97 at 20. An examination of the tickets revealed that Appellant, travelling under the name "Smith," had made a cash ticket purchase at 1:35 p.m. for a 2:15 p.m. trip from New York City to Cleveland. N.T. 5/14/97 at 37, 44–45. Agent Paret testified before the lower court that certain indicators raised his suspicions, including the name "Smith," which is frequently used by those travelling under an assumed name; the departure from New York City, a source city for narcotics; the cash ticket purchase; and the purchase of the ticket in close proximity to the beginning of a nine (9) to ten (10) hour trip. N.T. 5/14/97 at 44–46.

¶ 7 Agent Paret and Detective Schwartz boarded the bus and Agent Paret identified himself and Detective Schwartz over its public address system, explaining that they were on the bus to conduct a brief drug investigation, and thanking the passengers in advance for their cooperation. N.T. 5/14/97 at 47, 53. Detective Schwartz proceeded to the restroom to check for contraband, and, starting at the back of the bus, Agent Paret began speaking with the passengers, examining their tickets, and attempting to match passengers with their carry-on baggage. N.T. 5/14/97 at 27. Appellant was sitting in a window seat several rows from the rear of the bus, with another passenger occupying the aisle seat next to him. N.T. 5/14/97 at 45, 48. When Agent Paret asked Appellant to see his ticket receipt and some form of identification, Appellant produced the ticket receipt, but told the Agent he had no identification. N.T. 5/14/97 at 45–46. Agent Paret examined the ticket receipt, then returned it to Appellant. N.T. 5/14/97 at 49. Agent Paret also asked Appellant if he had any baggage, and Appellant identified a small white plastic bag underneath his seat. N.T. 5/14/97 at 46, 50. Agent Paret's suspicions were heightened by Appellant's

lack of identification and limited amount of luggage, in light of the nine (9) to ten (10) hour trip from New York City to Cleveland on which Appellant had embarked. N.T. 5/14/97 at 46.

¶ 8 Agent Paret asked Appellant for permission to search the plastic bag. N.T. 5/14/97 at 50. Appellant responded, "Go ahead," and handed Agent Paret the bag. N.T. 5/14/97 at 50. Agent Paret handed the bag to Detective Schwartz, and, with Appellant's permission, Detective Schwartz searched the bag. N.T. 5/14/97 at 29. The bag contained several articles of clothing, a pair of new Asics sneakers, and a sales receipt from the department store "Saks Fifth Avenue." N.T. 5/14/97 at 29. During their initial interaction with Appellant, Agent Paret stood in the aisle to the rear of Appellant's seat, and Detective Schwartz stood behind Agent Paret. N.T. 5/14/97 at 39, 48, 50. Agent Paret did not touch Appellant during their initial conversation, the aisle of the bus was unobstructed, and the bus door was open. N.T. 5/14/97 at 48–49.

¶ 9 During the investigation, other passengers were requested to identify their baggage, but one bag which had been placed in the overhead compartment remained unclaimed. N.T. 5/14/97 at 27–28, 32. Detective Schwartz walked up and down the aisle of the bus twice, holding the bag aloft to allow its owner to claim it. N.T. 5/14/97 at 28, 32. When no one identified the bag, Detective Schwartz exited the bus, and requested Mr. Prather's permission to search the bag. N.T. 5/14/97 at 32. Mr. Prather consented to the search, which revealed that the bag contained, among other things, over six (6) pounds of cocaine in an Asics shoe box, and a check summary with a social security number on it. N.T. 5/14/97 at 32, 51. Agent Paret and Detective Schwartz reboarded the bus, and discovered that Appellant had placed the small white plastic bag in the overhead compartment, and had placed the new Asics sneakers under the seat in front of him. N.T. 5/14/97 at 34. Detective Schwartz

observed that the Asics sneakers matched the shoe box containing the cocaine found in the unclaimed bag. N.T. 5/14/97 at 35. Agent Paret checked the other passengers' feet, and found that none were wearing Asics sneakers. N.T. 5/14/97 at 58. Appellant was handcuffed and removed from the bus, and during the search incident to Appellant's arrest, a small amount of marijuana was discovered. N.T. 5/14/97 at 35. Appellant was given *Miranda*[19] warnings and asked to provide information for a personal history form. N.T. 5/14/97 at 35–36, 54–55. The social security number which Appellant gave as part of this information was the same as the social security number found on the check summary. N.T. 5/14/97 at 36.

¶ 10 On February 27, 1997, Appellant filed an omnibus pre-trial motion seeking suppression on the grounds that the search of his person and possessions violated the Constitution of the Commonwealth of Pennsylvania and the Constitution of the United States. On March 25, 1997, the suppression court filed an order indicating that it was going to decide the omnibus pre-trial motion based on the briefs of the parties and notes of testimony of a preliminary hearing conducted before District Justice Charles P. Eyer on December 26, 1996. The motion was subsequently denied by a March 27, 1997 order, accompanied by a five (5) page opinion. A petition to reconsider the motion to suppress was also denied. On May 6, 1997, Appellant waived his right to a jury trial, and, following a May 14, 1997 bench trial, he was found guilty of possession of a controlled substance, possession with intent to deliver, and possession of marijuana. Sentencing was deferred pending a pre-sentence investigation. The Commonwealth subsequently filed a notice that it was going to seek a mandatory minimum sentence pursuant to 18 Pa.C.S.A. § 7508. Appellant objected to the imposition of a mandatory minimum sentence as unconstitutional, but on June 25, 1997, he was sentenced to seven (7) to fourteen (14) years imprisonment. Appellant filed a direct appeal to this Court, and, on February 25, 1998, a three member panel issued a memorandum opinion which vacated the denial of Appellant's suppression motion and remanded for trial. The Commonwealth filed an application for reargument *en banc*, which was granted on May 1, 1998.

¶ 11 On appeal before this Court, Appellant has raised the following issues: (1) Whether the trial court erred as a matter of law and abused its discretion in failing to grant Appellant's motion to suppress; and (2) Whether the trial court erred as a matter of law and abused its discretion in sentencing Appellant.

¶ 12 Addressing the suppression issue first, the following standard of review has been enunciated:

> When we review the ruling of a suppression court, we must determine whether its factual findings are supported by the record. Where the defendant challenges an adverse ruling of the suppression court, we will consider only the evidence for the prosecution and whatever evidence for the defense which is uncontradicted on the record as a whole; if there is support on the record, we are bound by the suppression court, and we may reverse that court only if the legal conclusions drawn from these facts are erroneous. Moreover, even if the suppression court did err in its conclusions, the reviewing court may nevertheless affirm its decision where there are other legitimate grounds for admissibility of the challenged evidence.

*Commonwealth v. Holt*, 711 A.2d 1011, 1014 (Pa.Super.1998) (citations omitted).

¶ 13 In denying Appellant's motion to suppress, I would hold that the trial court made findings of fact consistent with those made by this Court, *supra*, and, based on those findings, concluded that: (1) detaining the bus on which Appellant was a passenger did not constitute a seizure of

**19.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Appellant within the meaning of the Fourth Amendment to the United States Constitution; and (2) the warrantless search of the "Saks Fifth Avenue" bag [the unclaimed bag] did not constitute an unlawful search since Appellant had abandoned the bag and, therefore, had no reasonable expectation of privacy at the time of the search. Trial court opinion filed 3/27/97 at 3–5.

¶ 14 Pursuant to the standard of review enunciated in *Holt, supra,* I would conclude that the factual findings of the suppression court are supported by the record, and further, that the legal conclusions drawn from those findings are not erroneous in light of the evidence of record viewed in a light most favorable to the Commonwealth as verdict winner. Therefore, I would affirm the suppression court's denial of Appellant's omnibus pretrial motion.

¶ 15 Despite Appellant's assertion that both his state and federal constitutional rights have been violated, he fails to differentiate or distinguish in any way the protections granted by the Fourth Amendment to the United States Constitution,[20] as compared to the protections granted by Article 1, Section 8 of the Pennsylvania Constitution.[21] The wording of the Fourth Amendment is nearly identical to that of Article 1, Section 8 with regard to unreasonable searches and seizures, and although the courts are not bound to interpret the two provisions as if they were one and the same, *Commonwealth v. Edmunds,* 526 Pa. 374, 391, 586 A.2d 887, 895–896 (1991) (citations omitted), in the case *sub judice* I would conclude that neither provision has been violated.

¶ 16 Attempting to determine what type of police conduct is "unreasonable" requires a balancing of the privacy rights of citizens with the legitimate needs of the police force in protecting those citizens from crime. In making such determinations, three types of police contact have been recognized by the courts of Pennsylvania:

> The first of these is a "mere encounter" (or request for information) which need not be supported by any level of suspicion, but carries no official compulsion to stop or to respond. The second, an "investigative detention" must be supported by reasonable suspicion; it subjects a suspect to a stop and a period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of an arrest. Finally, an arrest or "custodial detention" must be supported by probable cause.

*In the Interest of S.J.,* 551 Pa. 637, 713 A.2d 45, 47 n. 3 (1998) (citations omitted).

¶ 17 "With respect to police conduct that falls short of an investigative stop, the Supreme Court has made it clear that a 'seizure does not occur simply because a police officer approaches an individual and asks a few questions.'" *United States of America v. Yong Hyon Kim,* 27 F.3d 947, 950 (3d Cir.1994) (citing *Florida v. Bostick,* 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991)). "Absent some coercive conduct by police, a request for cooperation or consent to search does not automatically convert an undeniably permissible encounter into an illegal seizure ..." *Commonwealth v. Shelly,* 703 A.2d 499, 502 (Pa.Super.1997) (citation omitted).

¶ 18 This Court explained in *In the Interest of Jermaine,* 399 Pa.Super. 503, 582 A.2d 1058 (1990), that the following factors are to be considered when determining if an encounter with the police rises to the level of a seizure of the person: "whether the officer makes a show of authority or exercises force, the officer's demeanor and manner of expression, the location, and the content of any interrogatories or state-

---

**20.** "[T]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...." U.S. Const. Amend. IV.

**21.** "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures...." Pa. Const. Art. 1, § 8.

ments." *Jermaine*, 582 A.2d at 1060 (citations omitted). Examples of circumstances which might indicate a seizure of the person include "a threatening presence of several police officers; the display of a weapon by an officer; some physical touching of the person of the citizen; or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Jermaine*, 582 A.2d at 1061. In the absence of such evidence, contact between an officer and a citizen cannot, as a matter of law, amount to a seizure of that person. *Jermaine*, 582 A.2d at 1061 (citation omitted).

¶ 19 In addition to the above circumstances, the courts of this state, as well as the courts of other states, have adopted the following objective standard for determining what amount of force escalates a mere encounter into an investigative detention:[22] whether, under all the circumstances surrounding the incident at issue, a reasonable person would believe he was free to leave. *Commonwealth v. Matos*, 543 Pa. 449, 457, 672 A.2d 769, 774 (1996) (citation omitted). This test was applied in cases involving police contact in airports and bus stations, but the United States Supreme Court in *Bostick, supra*, found that where police contact is initiated on a bus itself, the "free to leave" analysis is inapplicable, and the appropriate inquiry is "whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." *Bostick*, 501 U.S. at 436, 111 S.Ct. 2382.

¶ 20 In *Bostick*, the U.S. Supreme Court held that it is error for the states to adopt a per se rule that every police encounter on a bus is a seizure. In that case, as part of a drug interdiction program, two police officers wearing badges and insignia boarded a bus during a stopover from Miami to Atlanta. *Bostick*, 501 U.S. at 431, 111 S.Ct. 2382. One of the officers carried a gun in a pouch at his waist, but did not remove the gun while on the bus.

*Bostick*, 501 U.S. at 431, 111 S.Ct. 2382. Without articulable suspicion, the officers asked a passenger to present his ticket and identification. *Bostick*, 501 U.S. at 431, 111 S.Ct. 2382. These items matched, and were immediately returned to the passenger. *Bostick*, 501 U.S. at 431, 111 S.Ct. 2382. The officers then explained their presence and asked the passenger if he would consent to a search of his luggage. *Bostick*, 501 U.S. at 431–432, 111 S.Ct. 2382. Although the passenger later denied that he gave consent to search the bag in which the officers found cocaine, and also denied that he was informed of his right to refuse consent, the United States Supreme Court found that this issue involved a question of fact which had been resolved by the trial court in the state's favor, and therefore concluded that the passenger had been advised of his right to refuse consent. *Bostick*, 501 U.S. at 432, 111 S.Ct. 2382. After his arrest, the passenger moved to suppress the cocaine, but the motion was denied and he was convicted. *Bostick*, 501 U.S. at 432, 111 S.Ct. 2382.

¶ 21 Despite the fact that the United States Supreme Court has repeatedly held that mere police questioning does not rise to the level of a seizure, *Bostick*, 501 U.S. at 434, 111 S.Ct. 2382, the passenger argued on appeal that his case was different because the questioning occurred in the confines of a bus, and, under such circumstances, a reasonable person would not have felt free to leave the bus because there was nowhere to go and a passenger leaving the bus would run the risk of being stranded and losing whatever baggage was locked in the luggage compartment. *Bostick*, 501 U.S. at 435, 111 S.Ct. 2382. The United States Supreme court noted that the passenger's focus was misplaced, because "when [a] person is seated on a bus and has no desire to leave, the degree to which a reasonable person would feel that

---

**22.** An investigative detention is also known as a *"Terry* stop," after the United States Supreme Court decision of that name which permitted police officers to effect a precau-

tionary seizure where the police have a reasonable suspicion that criminal activity is afoot. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

he or she could leave is not an accurate measure of the coercive effect of the encounter." *Bostick*, 501 U.S. at 435–436, 111 S.Ct. 2382. The court further explained that the fact that the passenger did not feel free to leave the bus did not mean that the police had seized him, but was instead the natural result of his decision to remain on the bus which was scheduled to depart. *Bostick*, 501 U.S. at 435, 111 S.Ct. 2382. The passenger's freedom of movement was restricted by a factor independent of police conduct. *Bostick*, 501 U.S. at 435, 111 S.Ct. 2382. The United States Supreme Court concluded that the appropriate inquiry in such a situation is whether, taking into account all of the circumstances of the encounter, a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter.[23] *Bostick*, 501 U.S. at 435, 111 S.Ct. 2382.

¶ 22 Thus, an emphasis on Appellant's perceptions as to whether or not he felt free to leave the bus is misdirected. This Court's focus is on whether or not the conduct of the law enforcement officers would have caused a reasonable person to feel incapable of declining the officers' requests or otherwise terminating the encounter. The record in the instant case supports the conclusion that the behavior and conduct of Agent Paret and Detective Schwartz could in no way be construed by a reasonable person as preventing one from declining the officers' request for information or otherwise terminating the encounter. Any perception Appellant may have had that he was "restricted" was caused by circumstances independent of the conduct of the law enforcement officers, and therefore inapplicable to a determination of whether Appellant was "seized." *Bostick, supra.*

¶ 23 The *Bostick* standard has been applied in several cases helpful to review of the case at hand. For example, in *Commonwealth v. Lewis*, 535 Pa. 501, 636 A.2d

619 (1994), the Pennsylvania Supreme Court addressed the appeal of a defendant who had been approached by four police officers in a train station. When the officers asked the defendant if he would mind speaking with them, the defendant and his companion backed away, with the officers following, until the defendant was backed up to a wall. *Lewis*, 535 Pa. at 506, 636 A.2d at 622. After his arrest and conviction for possession with the intent to deliver a controlled substance and conspiracy, the defendant's appeal reached the Pennsylvania Supreme Court on allegations of Fourth Amendment and Article 1, Section 8 violations. The Supreme Court addressed the allegations by applying the *Bostick* standard to conclude that "under the totality of the circumstances, the police conduct would have communicated to a reasonable person that the person was not free to leave." *Lewis*, 535 Pa. at 509, 636 A.2d at 623. In concluding that a seizure occurred, the Court noted that "[i]t is not our intention to single out the fact that the Appellants were confronted by four police officers as dispositive of our inquiry, but the nature of the confrontation demonstrated a show of authority which constituted a restraint of the Appellant's liberty." *Lewis*, 535 Pa. at 509, 636 A.2d at 623.

¶ 24 In *Shelly, supra*, this Court followed the Pennsylvania Supreme Court's lead in applying *Bostick*. In *Shelly*, the appellant was a passenger in a car stopped by two Pennsylvania State Police officers for speeding. *Shelly*, 703 A.2d at 501. Both the driver and the appellant were asked for identification, but neither could produce any, and the appellant gave a false name to the police, in addition to giving vague and contradictory answers to their questions. *Shelly*, 703 A.2d at 501. A check revealed that the vehicle was not stolen, its registration card was returned to the driver, and he was given a warning for the speeding violation. *Shelly*, 703

---

**23.** Noting that the trial court denied the passenger's suppression motion without making express findings of fact, the U.S. Supreme

Court reversed the Florida Supreme Court and remanded the case.

A.2d at 501. The police officers then asked the driver if they could search the vehicle, and the driver consented. *Shelly*, 703 A.2d at 501. After the driver and the appellant stepped from the car,[24] both were frisked, and a pistol was discovered in the appellant's waistband. *Shelly*, 703 A.2d at 501. Later, when the appellant's clothes were searched at the prison, narcotics were discovered. *Shelly*, 703 A.2d at 501. On appeal, the appellant raised two issues for review: whether there was sufficient reasonable suspicion to justify a request for consent to search the car, and whether a valid *Terry* search for weapons was conducted. *Shelly*, 703 A.2d at 502. In concluding that the request to search did not violate the appellant's rights, this Court stated:

> Generally, there is no threshold of suspicion needed for a request to search; consent to a search obviates the need for any level of suspicion of the part of the police. If the driver herein voluntarily gave permission for the search, then no analysis of the information known to the troopers is necessary. The trial court found that consent was freely given, and we find no reason to dispute that finding.
>
> In *Lopez, supra*, we addressed a similar situation wherein officers made a valid traffic stop and eventually asked for consent to search. This court held Lopez's consent was requested while he was not free to leave, as the officer still held his license and registration. The court found Lopez was subject to detention that was coercive and rendered his consent less than voluntary. Here, as the trial court noted, the driver was free to go; his cards had been returned to him, he was given a warning for speeding, and the trooper had no hold on him at all at the time of the request. We decline to extend *Lopez* to create an absolute ban on legitimate, noncoercive roadside requests for consent.

*Shelly*, 703 A.2d at 502 (citing *Bostick, supra*; *Commonwealth v. Lopez*, 415 Pa.Super. 252, 609 A.2d 177 (1992)).

¶ 25 The *Bostick* standard has also been applied to police encounters on trains. In *Kim, supra*, the appellant disputed the denial of a suppression motion which arose from a drug interdiction effort which began with a police officer knocking on the door of the appellant's train car "roomette." When the appellant opened the door, the officer identified himself and showed his badge to the appellant and his companion. *Kim*, 27 F.3d at 949. Then, while kneeling in the hallway outside the door, the officer asked several questions regarding the passengers' trip and asked to see their tickets and some identification. *Kim*, 27 F.3d at 949. Both passengers provided their tickets, which the officer immediately handed back to them, but the appellant's companion was unable to provide any identification. *Kim*, 27 F.3d at 949–950. When the officer asked the appellant and his companion if they had any drugs in their luggage, they responded that they did not, and then consented to a search of the luggage. *Kim*, 27 F.3d at 950. The appellant's bag contained cans marked "Naturade All–Natural Vegetable Protein," which the appellant initially claimed he received as a present, then later claimed he bought from "the guy in L.A." *Kim*, 27 F.3d at 950. The appellant could not identify what the cans contained, and did not respond when asked "what guy?" *Kim*, 27 F.3d at 950. The officer tested the substance, which turned out to be methamphetamine. *Kim*, 27 F.3d at 950.

¶ 26 On appeal, the appellant argued that an unconstitutional seizure occurred when the officer questioned the appellant on the train. The court, citing *Bostick*, found that "a seizure does not occur simply because a police officer approaches an individual and asks a few questions. Only

---

24. The appellant did not contest that to mitigate danger in traffic stops, no reasonable suspicion of criminal activity is necessary for police to request the occupants of a lawfully stopped car to get out. *Commonwealth v. Brown*, 439 Pa.Super. 516, 654 A.2d 1096, 1102 (1995).

when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may [a court] conclude that a 'seizure' has occurred." *Kim*, 27 F.3d at 950. The court further concluded that "potentially incriminating questions do not by themselves make an encounter coercive." *Kim*, 27 F.3d at 953. Although the appellant argued that he was seized because the contact took place in a confined area in a non-public setting and the officer blocked the exit of the roomette, the court concluded that the officer did not block the doorway and "an individual may decline an officer's request without fearing prosecution, because a refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure," and further, that "the location in itself does not deprive an individual of his ability to terminate an encounter; he can reject an invitation to talk in a private, as well as a public place." *Kim*, 27 F.3d at 951–952 (citations omitted). The court also concluded that a confined area in a train is not inherently coercive. *Kim*, 27 F.3d at 952. The court rejected the appellant's argument that a "reasonable person would not feel free to decline to answer the officer's question or to shut the door, because 'it doesn't take much intelligence for a reasonable person to believe that shutting the door in the face of such an intruder would be to invite more serious intrusion.'" *Kim*, 27 F.3d at 952. (quotation omitted). The court disagreed, and, citing *Bostick* for the proposition that an individual may decline an officer's request without fearing prosecution, found that under the facts before it, "a reasonable person would have felt free to decline to speak or to terminate his conversation with [the officer]." *Kim*, 27 F.3d at 952. The court also rejected the appellant's argument that he was "seized" because the officer failed to advise him of this right to "decline the officers' requests or terminate the encounter," finding that the "absence of such advise does not necessarily eliminate the consensual nature of the encounter." *Kim*, 27 F.3d at 953. Noting that "a rea-sonable person is presumed to know of his right not to answer questions without fear of prosecution," the court concluded that the failure to advise the appellant of his right to terminate the conversation itself did not make the encounter unconstitutional. *Kim*, 27 F.3d at 953.

¶ 27 In determining that no constitutional violations occurred in the instant case with regard to the contact between Appellant and the police, I would make the following findings and conclusions: The drug interdiction effort which resulted in Appellant's arrest was conducted with the permission of the Delaware River Toll Bridge Commission; the bus was already stopped when Detective Schwartz asked the bus driver if he and Agent Paret could perform a check; and the bus driver voluntarily consented to the request to board the bus. Thus, there was no "seizure" of the bus and its passengers. *Shelly, supra.* Once on board, Agent Paret introduced himself and explained the reason for the officers' presence. Moreover, he did not threaten the passengers, or make an excessive display of authority which would intimidate them or coerce compliance with his request for cooperation. Agent Paret's actions in this regard did not elevate the encounter to an investigatory stop. Nor did the fact that Agent Paret did not specifically indicate to the passengers that they were free to not answer his questions elevate the encounter to an investigatory stop. *Matos*, 543 Pa. at 461, 672 A.2d at 775. ("It has long been the rule in Pennsylvania that an individual has no duty to stop or respond to an inquiry by the police. Although the police may initiate an encounter with a suspect, and request information absent any level of suspicion, that encounter 'carries to official compulsion to stop or respond.'"). *See Kim, supra.*

¶ 28 When Agent Paret began his interaction with Appellant, he stood behind Appellant's seat, leaving a clear path down the aisle to the open bus door. He did not threaten Appellant, touch Appellant in any way, or even accuse him of any criminal

activity. After Appellant produced his ticket receipt, Agent Paret did not retain it while conversing with Appellant, but instead handed it back to him. Agent Paret's demeanor was polite and non-confrontational, and his weapon remained hidden by his jacket at all times. During the interaction between Agent Paret and Appellant, Detective Schwartz remained in a non-threatening position behind Agent Paret, where he would not block Appellant's exit. The law enforcement officers clearly acted in a professional manner, consistent with principles of constitutional law, and their conduct did not elevate the encounter to a "seizure." *Bostick, supra*; *Kim, supra.*

¶ 29 Based on my analysis of the circumstances presented to this Court, and the applicable case law, I find that the location of the encounter, i.e a bus, did not render the interaction here a "seizure." I conclude that under all of the circumstances surrounding this encounter, the conduct of Agent Paret and Detective Schwartz would not have communicated to a reasonable person that the person was not free to decline Agent Paret's requests, or otherwise terminate the encounter. *Bostick, supra*; *Lewis, supra.* Moreover, I find that the interaction between Appellant, Agent Paret, and Detective Schwartz did not rise above the level of a mere encounter, and that Appellant was not "seized" for the purposes of the Fourth Amendment or Article 1, Section 8. As such, I conclude that his consent to search the bag at his feet was voluntary, and the constitutional claims with regard to the search of that bag must fail.

¶ 30 In light of this determination, it is clear that the suppression court's denial of Appellant' motion with regard to the alleged seizure of Appellant's person was supported by the record and did not involve erroneous legal conclusions. As such, I believe that this Court is bound by the suppression court's ruling.

¶ 31 Because Appellant's contact with Agent Paret and Detective Schwartz was a mere encounter, I find that his argument with regard to "coerced abandonment" of the bag containing the cocaine must also fail. "It is axiomatic that a defendant has no standing to contest the search and seizure of items which he has voluntarily abandoned." *Commonwealth v. Tillman*, 423 Pa.Super. 343, 621 A.2d 148, 150 (1993) (citation omitted). *Commonwealth v. Shoatz*, 469 Pa. 545, 553, 366 A.2d 1216, 1220 (1976) ("[I]t is well settled that no one has standing to complain of a search or seizure of property that he has voluntarily abandoned."). However, this Commonwealth has adopted a theory of abandonment only when it is shown that the seized evidence was not discarded because of unlawful police coercion. *Shoatz*, 469 Pa. at 553, 366 A.2d at 1220. As the Pennsylvania Supreme Court explained in *Shoatz*:

> The theory of abandonment is predicated upon the clear intent of an individual to relinquish control of property he possesses.
>
> Abandonment is primarily a question of intent, and intent may be inferred from words spoken, acts done, and other objective facts. All relevant circumstances existing at the time of the alleged abandonment should be considered. Police pursuit or the existence of a police investigation does not of itself render abandonment involuntary. The issue is not abandonment in the strict property-right sense, but whether the person prejudiced by the search had voluntarily discarded, left behind, or otherwise relinquished his interest in the property in question so that he could no longer retain a reasonable expectation of privacy with regard to it at the time of the search.

*Shoatz*, 469 Pa. at 553, 366 A.2d at 1220. (citations omitted).

¶ 32 If a person is not subject to a seizure when an abandonment occurs, the action of abandonment is not the result unlawful police coercion, and the abandoned item may be admitted as evidence. *Commonwealth v. Riley*, 715 A.2d 1131, 1134 (Pa.Super.1998).

¶ 33 In the case *sub judice,* a review of all relevant circumstances existing at the time of the alleged abandonment shows that Appellant intended to abandon the bag in which the cocaine was found, as can be inferred from Appellant's actions, or, more precisely, inaction. When initially asked by Agent Paret if he had any baggage, Appellant identified only the bag at his feet. When the second bag remained unclaimed, and Detective Schwartz held it aloft and walked up and down the aisle two times, asking its owner to identify himself or herself, Appellant remained silent. Appellant's failure to claim the bag under such circumstances amounts to abandonment. Further, the encounter between Appellant and the officers did not amount to unlawful police coercion and did not render the abandonment involuntary. *Shoatz,* 469 Pa. at 553, 366 A.2d at 1220. Having concluded that a mere encounter occurred between Appellant and the police officers and that Appellant was not "seized" during that encounter, I would further conclude that Appellant voluntarily abandoned the bag containing the cocaine, and, as a result, I would find that it may be used for evidentiary purposes.

¶ 34 Again, in light of this determination, I believe that it is clear that the suppression court's denial of Appellant' motion with regard to the abandonment of the bag containing the cocaine was supported by the record and did not involve erroneous legal conclusions, and, therefore, this court is bound by the suppression court's ruling in this regard.

¶ 35 In light of my conclusion regarding Appellant's suppression claim, I would address his sentencing allegation thusly: Appellant initially argues that the trial court erred in imposing a mandatory minimum sentence. Ostensibly, Appellant claims that mandatory minimum sentences are unconstitutional as violative of individual due process rights and Eighth Amendment rights guaranteed under the Constitution. I disagree.

¶ 36 The Pennsylvania Supreme Court has consistently held that enactments of the General Assembly enjoy a strong presumption of constitutionality. *Commonwealth v. Barud,* 545 Pa. 297, 304, 681 A.2d 162, 165 (1996) (citing *Commonwealth v. Mikulan,* 504 Pa. 244, 247, 470 A.2d 1339, 1340 (1983)). All doubts are to be resolved in favor of sustaining the constitutionality of the legislation. *Commonwealth v. Blystone,* 519 Pa. 450, 463, 549 A.2d 81, 87 (1988), *affirmed,* 494 U.S. 299, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990) (citing *Hayes v. Erie Ins. Exchange,* 493 Pa. 150, 155, 425 A.2d 419, 421 (1981)). "[N]othing but a clear violation of the Constitution—a clear usurpation of power prohibited—will justify the judicial department in pronouncing an act of the legislative department unconstitutional and void." *Glancey v. Casey,* 447 Pa. 77, 88, 288 A.2d 812, 818 (1972) (quoting *Busser v. Snyder,* 282 Pa. 440, 449, 128 A. 80 (1925)). In other words, "we are obliged to exercise every reasonable attempt to vindicate the constitutionality of a statute and uphold its provisions." *Commonwealth v. Chilcote,* 396 Pa.Super. 106, 578 A.2d 429, 435 (1990) (citing *Commonwealth v. Trill,* 374 Pa.Super. 549, 543 A.2d 1106, 1116 (1988)). "The right of the judiciary to declare a statute void, and to arrest its execution, is one which, in the opinion of all courts, is coupled with responsibilities so grave that it is never to be exercised except in very clear cases." *Erie & North–East Railroad Co. v. Casey,* 26 Pa. 287, 300 (1856). Moreover, one of the most firmly established principles of our law is that the challenging party has a heavy burden of proving an act unconstitutional. *Barud,* 545 Pa. at 304, 681 A.2d at 165. In order for an act to be declared unconstitutional, the challenging party must prove the act "clearly, palpably and plainly" violates the constitution. *Barud,* 545 Pa. at 304, 681 A.2d at 165. *See Blystone, supra.* Finally, I note that:

The power of judicial review must not be used as a means by which the courts might substitute its judgment as to public policy for that of the legislature. The role of the judiciary is not to question

the wisdom of the action of [the] legislative body, but only to see that it passes constitutional muster.

*Finucane v. Pennsylvania Marketing Bd.*, 136 Pa.Cmwlth. 272, 582 A.2d 1152, 1154 (1990) (citations omitted).

¶ 37 Appellant's policy arguments against mandatory sentencing are not shared by either the legislature or the courts of this Commonwealth. As the Pennsylvania Supreme Court has held, mandatory sentencing provisions do not violate a person's Constitutional rights. *See Commonwealth v. Bell*, 512 Pa. 334, 342, 516 A.2d 1172, 1176 (1986). More specifically, the Supreme Court has found that mandatory minimum sentencing provisions do not violate due process rights. *See Commonwealth v. Sargent*, 349 Pa.Super. 289, 503 A.2d 3, 5 (1986). In *Sargent*, a panel of this Court found that the only issue in regard to due process and application of the mandatory sentencing provision, is whether a defendant receives notice by the Commonwealth that they will be seeking imposition of a mandatory sentence.

¶ 38 Instantly, I fail to see how Appellant has been denied due process. In fact, Appellant has failed to specifically discuss how his due process rights have been violated. Appellant was informed that the Commonwealth would be seeking a sentence under the mandatory sentencing guidelines. Thus, Appellant's claim is meritless.

¶ 39 Appellant next argues that mandatory sentencing provisions violate his Eighth amendment protection against cruel and unusual punishment because his punishment is disproportionate to the crime for which he was convicted. In *Commonwealth v. Green*, 406 Pa.Super. 120, 593 A.2d 899 (1991), this Court found that application of 18 P.S. § 7508 was not a violation of the Eighth Amendment's prohibition against cruel and unusual punishment and that its application was not disproportionate to a defendant's crime. The defendant in *Green* reasoned that due to his advanced age and poor physical health, imposing a mandatory sentence was tantamount to cruel and unusual punishment. As this court found in *Green*, "the legislature, by enacting Section 7508, has announced that drug offenses are serious crimes from which the public needs to be protected." *Green*, 593 A.2d at 902. Therefore, we held that the mandatory sentencing provided for by Section 7508 serves as a suitable deterrent and was not a violation of an Appellant's Eighth Amendment rights.

¶ 40 In the instant case, I would find that the sentence which Appellant received is constitutional and not violative of either Appellant's due process rights or Eighth Amendment rights.

¶ 41 For the reasons discussed above, I would affirm the judgment of sentence.

¶ 42 EAKIN and LALLY–GREEN, JJ. join the Dissenting Opinion by STEVENS, J.