**Commonwealth v. Rodriguez**

*Jeffrey Burd, deputy district attorney,* for Common-
wealth.

*John Waldron,* for defendant.

ANTHONY, *J.,* April 9, 2009—The defendant was charged with possession with intent to deliver a controlled substance (marijuana),[1] possession of a small amount of marijuana,[2] and possessing an instrument of crime[3] following an incident that took place on May 13, 2008.

On September 17, 2008, the defendant filed omnibus pretrial motions consisting of (1) motion for suppression of evidence and (2) motion for discovery. Pretrial hearings were held on November 26, 2008, and February 10, 2009, the latter at the request of defendant's counsel.[4]

At the hearing of November 26, 2008, Officer Joshua Brubaker of the Allentown Police Department (APD) testified. At the hearing of February 10, 2009, Evaristo Rodriguez (defendant) testified, and I admitted into evidence photographs of the belt, trousers, and shirt the defendant wore at the time of his arrest as D-2, D-3 and D-4, respectively. Although Brubaker appeared for the hearing of February 10, 2009, he did not testify. At that same hearing, defendant's counsel offered into evidence Brubaker's arrest report of May 13, 2008, as D-1, pursuant to Pa.R.E. 803.1(1)(b), and I took the question of the admissibility of the report under advisement. Thereafter, I reviewed Brubaker's earlier testimony and determined that the report is admissible as an inconsistent statement of a witness.

---

1. 35 P.S. 780-113(a)(30).

2. 35 P.S. 780-113(a)(31)(i).

3. 18 Pa.C.S. 907(c).

4. At the November 26, 2008 hearing, and by agreement of the parties, the motion for discovery was dismissed as moot.

Defendant's counsel filed a brief wherein he argued, inter alia, that Brubaker is not credible based on inconsistencies and discrepancies between his testimony and his report, and that the evidence should be suppressed. The district attorney sent to me a letter brief wherein he argued that the evidence should not be suppressed.

## THE EVIDENCE

### *Officer Brubaker's Testimony*

At the hearing of November 26, 2008, Brubaker stated on direct examination that he has been a police officer for approximately four years, with approximately two years with the Allentown Police Department (APD). He further testified that on May 13, 2008, he drove to Jack's Pizza (no location was given) in full uniform and driving a police cruiser, and walked into the establishment at approximately 11 a.m. "to pick up a food order for personnel working at headquarters that day." While inside, he observed the defendant standing in front of a counter. The defendant looked in the direction of Brubaker, and Brubaker watched the defendant walk away from the counter "to the center booth, located in the pizza shop, and sit down." Brubaker observed a bulge on the defendant's right hip while the defendant was at the counter, but could not tell, at least initially, whether the defendant was carrying a concealed weapon.

An employee of Jack's Pizza advised the defendant that his pizza was ready, and after looking at Brubaker for a few seconds, the defendant stood up and walked up

to the counter. At this point Brubaker observed the outline of a firearm underneath the defendant's shirt. Brubaker commented that his ability to identify the weapon was based on training he received on the identification of firearms through the "Philadelphia Fraternal Police Lodge," regular observation of individuals who possess firearms, previous arrests of individuals with concealed firearms, and his practice of always carrying a concealed firearm while not on duty.

Brubaker waited for the defendant to sit down. According to Brubaker, the defendant appeared to be very nervous. When the defendant sat down, he picked up the slice of pizza, put the slice back down, then placed his hands on the table, bowed his head, and prayed. While he was praying, Brubaker walked up to and then behind the defendant. The defendant noticed Brubaker before he started to walk behind him, and Brubaker observed the defendant reach for the firearm. By the time Brubaker got behind the defendant, the defendant's "hand was already forming to the shape of the handle of the firearm and was less than an inch from the grip of the firearm." At that point, Brubaker put his "hand on the handle of the firearm to prevent [the defendant] from being able to pull the firearm."

After Brubaker put his hand on the handle of the firearm, he grabbed the defendant's wrist with his left hand, put him in a wristlock and placed handcuffs on him. At the point he was being handcuffed, the defendant told Brubaker he had a concealed weapons permit in his front pocket, stating he was trying to reach for it. Brubaker stood the defendant up, and attempted to remove his gun

from his waistband, as he was concerned the defendant may still be able to reach the gun. Brubaker has had a number of experiences with handcuffed individuals who were able to move their hands from the back to the front of their bodies.

According to Brubaker, he had to undo the defendant's belt in order to remove the firearm (he did not explain why). When he pulled up the defendant's shirt to undo his belt, he noticed a portion of a plastic bag sticking out of the fly of the defendant's trousers. Based on his basic training and education at the police academy, at least 72 hours of drug intelligence and drug identification classes following the academy, and dozens of drug arrests, Brubaker concluded the bag "probably" contained drugs. Brubaker undid the belt and immediately removed the firearm due to safety considerations. Upon removing the defendant's belt, the defendant's pants fell to the ground. Brubaker removed a baggie from the fly, and observed that it contained nine zip lock-type bags of a greenish-brown vegetable matter, which he believed to be marijuana.

After the firearm was secured, Brubaker found a concealed weapons permit in the defendant's "back right pocket". He transported the defendant to headquarters where the defendant was searched. He found $430 in various denominations on the defendant. He contacted the Lehigh County Sheriff's Department and confirmed that the defendant's concealed weapons permit was valid.

On cross-examination, Brubaker confirmed that the defendant carried the concealed weapon on his right hip,

a common location. He agreed that the gun was in proximity to where he located the permit. When asked why he walked behind the defendant, Brubaker stated:

"I asked him several times what the bulge was on his waist, and he said nothing several times, and I know in my experience, that people carry firearms illegally throughout the entire state and throughout the entire county, and it's my duty as a police officer to determine who carries a firearm legally and who carries one illegally." [5]

Brubaker acknowledged that he did not mention this aspect of the events when testifying on direct examination. Brubaker explained that had the defendant advised him beforehand that he had a concealed weapons permit, he "would have handled the situation completely differently."

On redirect examination, Brubaker commented that while at police headquarters, another officer discovered that the defendant was wearing body armor.

### Defendant's Testimony

At the hearing of February 10, 2009, the defendant indicated on direct examination that he was in Jack's Pizza on May 13, 2008, at approximately 11 a.m., and he ordered a slice of pizza. He sat down and then observed Officer Brubaker walk into the restaurant. He noted that Brubaker walked immediately to the counter. The defendant was advised his slice was ready, so he went to the counter, picked up the slice, and went back

5. N.T., November 26, 2008, p. 21.

to his seat and "said a quick prayer". The defendant was wearing a black belt approximately one and one-half inches in width, a pair of fairly new blue jeans, and a collarless long-sleeved brown, thermal-type shirt made of stretch fabric (photos of these items were admitted into evidence as D-2, D-3 and D-4, respectively).

The defendant had a handgun contained in a holster attached to his belt. He had a concealed carry permit in his wallet located in his right back pocket. The holster was attached to the belt through a hole in the holster, and the gun was removable by lifting a snapped metal button, or by lifting a Velcro strap. According to the defendant, it was not necessary to remove the holster from the belt in order to remove the gun from the holster.

The holster containing the gun was situated on the defendant's right hip midway between his right front and right rear pockets. The bottom of the brown shirt covered the gun and the holster, creating a bulge under the shirt that was plainly visible. When Rodriguez went to obtain his slice of pizza, he walked past Brubaker who was standing to his right side. He testified as follows regarding the events leading up to his arrest:

"*Q: [Attorney Waldron]:* What occurred next relative to Officer Brubaker?

"*A: [The defendant]:* Well, the officer, he looked at me. He goes, what do you have there? I told him I had a firearm, and that I had a permit to carry it, and that I knew the Sheriff, and he proceeded to say he didn't care.

"*Q:* What did he do specifically?

"*A:* Well, after that, he immediately approached me, and he started walking behind me. At this point, I'm still

sitting down. So, I mean, I didn't react at all. I just sat there. So, he walks up behind me, and he puts his hand immediately on the gun. . . . I was trying to relay to him that I had an actual gun permit at the time. . . . He says, he didn't care. . . . [H]e put his hand on the gun, and then, at that point, I was still sitting down at the booth. So, he grabbed my arm, and he put it in a wrist lock.

"*Q:* Which arm?

"*A:* My right arm. . . . Then he yelled out, put your hand on your head. So, I put my left hand on my head . . . . He immediately put the cuffs on my one hand that he had already in possession, and then he put my other arm down like in an arresting position, and he just cuffed me. . . . I was cuffed from behind, and I kept trying to communicate with him and tell him that I had an actual permit, but he kept saying that he didn't actually care. So, I actually told him to reach in my back pocket to get the permit. So, that's when he actually went back in the pocket, and with one hand grabbed — he did it all with one hand. He pulled out the wallet.

"*Q:* Which hand did he do it with?

"*A:* His left hand.

"*Q:* Where was his right hand?

"*A:* He was like, trying to detain me. Like, I wasn't— he was just trying, he just had one hand on the hand-cuffs.

"*Q:* So, he had his right hand on the handcuffs?

"*A:* Yeah.

"*Q:* And his left hand, he then did what?

"*A:* He went into my back pocket and pulled my wallet out. . . . With one hand, he slid out my ID, my driver's license. Basically, all the cards that I had, he just whipped them all out, like everything on the table, with my permit and everything.

"*Q:* And did he see your permit at that point and time?

"*A:* Yes, definitely. . . . He then said, well, let's see what else you have on you. He basically, he pulled my shirt up, and then he started another search. . . . He went in my front pocket, and then he seen the baggies sticking out of the fly. So, he suggested, do you have crack on you? I said no. And then, he basically, he unstrapped my belt, unzipped my zipper, and my pants fell down, and I was in the restaurant in just my underwear, basically.

"*Q:* And at that point and time, your permit had already been viewed by him and was on the table?

"*A:* Yeah. My permit was on the table, my ID, driver's license, the gun was on the table. And at that point, there was already back up in the store. So, there was two other officers there. . . .

"*Q:* Now, in order to take—as I understand it, in order to take the gun out of the holster, you'd have to first lift up your long John; correct?

"*A:* Yes.

"*Q:* And then lift up the holster to then remove the gun from the holster correct?

"*A:* Yes."

On cross-examination, the defendant acknowledged that after Brubaker placed handcuffs on him, the defen-

dant gave him permission to retrieve his permit from his wallet, so Brubaker lifted up his shirt and pulled out his wallet from his right rear pocket. The defendant indicated that by the time his "pants were down, the gun was already on the table with the permit" along with other items from his wallet.

I questioned the defendant and he stated that after he was handcuffed, the gun was taken out of the holster and placed on the table, and then the contents of his wallet, including the permit, were removed and placed on the table. He indicated Brubaker stated to him he wanted to see what else he had on his person, so he searched the defendant's front pockets and recovered his "rent money" in the approximate sum of $400. The defendant noted that when the officer lifted up his shirt in order to search his front pockets, the portion of the plastic baggie sticking out of the defendant's zipper, which until this point was covered, was now visible.

### Brubaker's Report

"Brubaker's report of May 13, 2008, states as follows:

"R/O [Reporting Officer] was assigned to duty officer position at HQ. R/O took marked patrol unit 503 to Jacks [sic] Pizza to pick up lunch. R/O was in full uniform. R/O went into Jacks [sic] Pizza and observed a male standing at the counter with his right hip bladed toward R/O. R/O observed that the male had a buldge [sic] on his right hip consistant [sic] with that of a gun handle. Male then observed R/O and quickly went and sat down. As soon as the male sat down, one of the Jacks [sic]

employees stated that the males [sic] pizza was ready. The male sat for a few seconds and stared at R/O and then got up to get the pizza. At that point it became more aparent [sic] to the R/O that the male had a firearm under his shirt due to the fact that his right hip was towards R/O while the male was walking to get his pizza. R/O waited for male to sit down until talking to him. R/O asked male what was on his waist, as R/O was walking towards the male. R/O went behind male and he began to reach towards the location of the firearm. R/O grabbed the males [sic] hand and placed him into a wrist lock. R/O then called for another unit. R/O cuffed male and asked male what he was reaching for. Male relayed he was reaching for his front pocket. R/O asked male what was in his front pocket. Male relayed he was reaching for his weapons permit. R/O did locate a weapons permit in the males [sic] back right pocket. R/O pulled up males [sic] shirt to recover the firearm, and take it off of his belt for officer safety. R/O undid males [sic] belt and saw a plastic baggie sticking out of the males [sic] fly/zipper. R/O removed it and found it to contain (nine) ziplock type baggies with greenish-brown vegtable [sic] matter. Vegtable [sic] matter did later test positive for marijuana. R/O also located $430 of U.S. currency. It was 16: 20 dollar bills; 4: 10 dollar bills; 11: 5 dollar bills; and 15: 1 dollar bills. R/O also recovered keys to a Toyota. Male relayed that his moms [sic] Toyota was parked outside and she lives in CT. Sgt. Brader asked the owner of Jack's Pizza if he would like the car towed due to it being on private property, and he stated yes. R/O checked vehicle for items of value before towing it. R/O located two black guns under the driver seat, three cell phones, one box of ammo in the rear of the passenger seat and one box of

ammo in the spare tire in the trunk. Cell phones and cash seized. Suspected marijuana logged into evidence and sent to PSP for further testing. R/O read male his rights and he agreed to talk, however he would not give any information. Males [sic] criminal history was negative."

## FINDINGS OF FACT

After careful review of the evidence, I make the following findings of fact:

(1) The defendant was in Jack's Pizza, on May 13, 2008, at approximately 11 a.m.

(2) The defendant was wearing jeans, a belt, and a stretch fabric shirt.

(3) The defendant was carrying a concealed weapon in a holster attached to the belt.

(4) The defendant was wearing body armor under his clothing.

(5) The stretch fabric shirt covered the holster and gun, and the top of the fly of the defendant's jeans.

(6) The defendant's fly was secured with a zipper.

(7) A portion of a clear plastic baggie protruded from the top of the defendant's fly.

(8) The bulk of the plastic baggie was inside the defendant's jeans.

(9) The plastic baggie contained nine small plastic zip lock-type bags of greenish-brown vegetable matter.

(10) The plastic baggie was held in place by the zipper.

(11) The bottom of the defendant's shirt covered the protruding portion of the plastic baggie.

(12) At all times material hereto, the defendant was aware he had the items mentioned above concealed on his person.

(13) Brubaker walked into Jack's Pizza on May 13, 2008, at approximately 11 a.m.

(14) Brubaker was in full uniform.

(15) The defendant was in Jack's Pizza when Brubaker arrived.

(16) The defendant observed Brubaker shortly after Brubaker walked into Jack's Pizza.

(17) Brubaker observed the defendant shortly after he walked into Jack's Pizza.

(18) The defendant was standing at a counter when Brubaker initially observed him.

(19) The defendant ordered a slice of pizza while standing at the counter.

(20) Brubaker was standing to the defendant's right side.

(21) Brubaker observed a bulge on the defendant's right hip while the defendant was standing at the counter.

(22) The defendant walked away from the counter.

(23) The defendant sat down at a booth and waited for his slice of pizza to be prepared.

(24) After a few minutes, an employee of Jack's Pizza advised the defendant that his pizza was ready.

(25) The defendant hesitated, looked at Brubaker, and went to the counter in order to retrieve the slice of pizza.

(26) The defendant was visibly nervous.

(27) Brubaker observed the defendant and believed he appeared to be nervous.

(28) When the defendant went to the counter in order to retrieve the slice of pizza, Brubaker again observed the bulge on the defendant's hip.

(29) The bulge appeared as an outline of a handgun.

(30) Based on his training, education and experience, Brubaker concluded the defendant was carrying a handgun.

(31) The defendant returned to the booth with the slice of pizza.

(32) The defendant sat down.

(33) The defendant picked up the slice of pizza, put the slice back down, placed his hands on the table, bowed his head, and prayed.

(34) While he was praying, Brubaker walked towards the defendant.

(35) The defendant noticed Brubaker as he was walking towards him.

(36) Brubaker asked the defendant what the bulge was on his waist.

(37) The defendant replied "nothing" or words to that effect.

162

(38) Brubaker walked towards the rear of the defendant while the defendant was still seated at the booth.

(39) The defendant reached towards the area of his right hip with his right hand.

(40) The defendant's right hand formed to the shape of a handle of a firearm.

(41) Brubaker observed the defendant reach towards the area of his right hip with his hand forming to the shape of a handle of a firearm.

(42) Brubaker believed the defendant was reaching for a firearm.

(43) When his hand was less than one inch from the suspected firearm, Brubaker intercepted the defendant's movements by placing his right hand on what turned out to be the handle of a handgun.

(44) Using his left hand, Brubaker placed the defendant in a wristlock, and then handcuffed both of the defendant's hands behind the defendant's back.

(45) While being handcuffed, the defendant stated to Brubaker he had a concealed weapons permit in his front pocket, and advised it was what he was reaching for when Brubaker placed him in a wristlock.

(46) Brubaker stood up the defendant from his seated position and lifted the front of the defendant's shirt in order to remove the defendant's belt and gun.

(47) When Brubaker lifted the front of the defendant's shirt, he observed the portion of the baggie sticking out of the defendant's fly.

(48) When Brubaker picked up the defendant's shirt and saw the portion of the plastic baggie sticking out of the defendant's fly, he concluded, based on his training, education and experience, the defendant was likely concealing illegal drugs.

(49) Brubaker removed the defendant's belt, thereby removing the firearm and the holster from the belt.

(50) After Brubaker removed the defendant's belt, the defendant's trousers fell to the ground.

(51) When the trousers were on the ground, Brubaker immediately saw a clear plastic baggie containing a greenish-brown vegetable matter from inside the defendant's trousers.

(52) Based on his training, education and experience, Brubaker believed the baggie contained marijuana.

(53) Brubaker removed the baggie from inside the defendant's trousers.

(54) The plastic baggie contained nine smaller clear plastic bags of the suspected marijuana.

(55) Brubaker removed the defendant's wallet from his right rear pocket, and removed the contents from the wallet including a concealed weapons permit.

(56) Brubaker also recovered from the defendant $430 in U.S. currency in various denominations.

(57) At police headquarters, the defendant was found to be wearing body armor.

(58) Police confirmed the defendant had a valid permit to carry a concealed weapon after the defendant was taken into custody.

## DISCUSSION

When deciding a motion to suppress, the court is required to make findings of fact and conclusions of law in order to determine whether the challenged evidence was legally obtained. Pa.R.Crim.P. 581(H); *Commonwealth v. Wilmington,* 729 A.2d 1160, 1162 (Pa. Super. 1999). The Commonwealth bears the burden of establishing, by a preponderance of the evidence, that the challenged evidence was not obtained in violation of the defendant's rights. Pa.R.Crim.P. 581(H); *Commonwealth v. Smith,* 784 A.2d 182, 186 (Pa. Super. 2001). Any determinations of witness credibility and what weight should be afforded their testimony are within the exclusive province of the trial court. *Commonwealth v. Fitzpatrick,* 446 Pa. Super. 87, 91, 666 A.2d 323, 325 (1995).

Under certain circumstances, the police are justified in briefly stopping and frisking an individual for investigatory purposes.

"In order for such a stop to be reasonable under the Fourth Amendment to the United States Constitution, the police conduct must meet two separate and distinct standards. First, the police officer must point to specific and articulable facts which warrant the initial stop . . . . This standard is met 'if the police officer observes unusual and suspicious conduct on the part of the individual seized which leads him reasonably to believe that criminal activity may be afoot. . . .' . . . Second, if the reasons for the stop meet the standard and, therefore, it is deemed reasonable for Fourth Amendment purposes, a police officer may frisk the individual to search for

weapons." *Commonwealth v. Robinson,* 410 Pa. Super. 614, 619, 600 A.2d 957, 959 (1991). (citations omitted)

In addition, "possession of a concealed firearm by an individual in public is sufficient to create a reasonable suspicion that the individual may be dangerous, such that an officer can approach the individual and briefly detain him in order to investigate whether the person is properly licensed." *Commonwealth v. Stevenson,* 894 A.2d 759, 772 (Pa. Super. 2006) (quoting *Commonwealth v. Robinson,* 410 Pa. Super. 614, 619, 600 A.2d 957, 959 (1991)). Officer safety, and the safety of the public, "must always be afforded *great weight* when balanced against the privacy rights of an individual during an investigatory detention and pat down or frisk for weapons." *Id.* (emphasis in original)

In the case sub judice, Brubaker had a reasonable suspicion to stop the defendant, briefly detain him, and to secure his weapon. Based on his training and experience, the essential facts available to Officer Brubaker were as follows: the defendant was carrying a concealed weapon; the defendant acted visibly nervous when Brubaker entered Jack's Pizza, Brubaker saw an outline of a handgun underneath the defendant's shirt on the defendant's right hip; when asked what was on his hip, the defendant stated "nothing"; and the defendant began to reach towards the suspected handgun when Brubaker approached. Taking all these facts into consideration, I find Brubaker's actions in restraining the defendant and securing the weapon were justified. When the defendant's pants fell to the ground after removal of the belt, Brubak-

er, upon seeing apparent marijuana in a clear plastic baggie, had probable cause to believe the defendant was in possession of a controlled substance. Accordingly, he was justified in removing the baggie from inside the defendant's pants and securing this and other evidence.

The actions leading up to the seizure of the suspected marijuana constituted only a limited intrusion upon the defendant's privacy rights when balanced against the safety concerns of Brubaker and the general public. See *id.,* 894 A.2d 759. To hold otherwise under these circumstances would do violence to the well-considered reasoning of *Terry [v. Ohio,* 392 U.S. 1 (1968)] . . . and analogous cases." *Id.,* 894 A.2d at 773.

The defendant's motion to suppress is denied.

## ORDER

And now, April 9, 2009, upon consideration of defendant's motion for suppression of evidence, and hearings held on the motion,

It is ordered that the defendant's motion is denied and dismissed.